## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

_____

BRET BODIN, DARIAN
MORGAN, BRAD NEWELL,
MICHAEL ROSAS,
MID-CITY MIKE RENTALS, LLC,
 and AIRBNB, INC.,

                Plaintiffs,

    v.

THE CITY OF NEW ORLEANS,

              Defendant.
_____

)
)
)
)
)
)
)
)
)
) Civil Action No. _____
)
) SECTION:
)
) DISTRICT JUDGE:
)
) MAGISTRATE JUDGE:

### COMPLAINT

Plaintiffs Bret Bodin, Darian Morgan, Brad Newell, Michael Rosas, Mid-City

Mike Rentals, LLC ("Host Plaintiffs"), and Airbnb, Inc. ("Airbnb"), for their

Complaint against Defendant the City of New Orleans (the "City"), allege as

follows:

### INTRODUCTION

1.     This lawsuit challenges a series of unprecedented restrictions on short-

term rentals and short-term rental platforms imposed by the City of New Orleans in

Ordinance No. 29381 M.C.S. and Ordinance No. 29382 M.C.S. (the "2023

Ordinances"), as well as Ordinance No. 30074 M.C.S. (the "2024 Ordinance"), and the City's actions in implementing those Ordinances.

2. Dating back to our nation's founding, property owners have acted as the gatekeepers of their property by exercising their right to lease, *i.e.*, leasing the property to another for whatever duration the owner sees fit. The U.S. Supreme Court has also recognized that "the right to exclude others [is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (punctuation omitted) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)); *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). The corollary of that right to exclude is the right to include. For these reasons, the right to lease as well as the right to exclude and include others have been essential attributes of property ownership. Homeowners throughout history have taken advantage of these rights to unlock the true value of their properties: They have shared their property and earned income by renting all or part of their home to travelers needing a place to stay, whether for short or long periods.

3. Platforms like Airbnb have made this longstanding practice possible by connecting travelers and hosts through the internet, to the benefit of hosts, travelers, and the broader community. In New Orleans, a typical host using Airbnb earned $16,000 in 2023 from short-term rentals, and approximately 60% of hosts surveyed

reported that this income helped them stay in their homes.  Short-term rentals also benefit travelers by providing additional choices of properties, location, and affordability, compared to other accommodations like hotels or bed-and-breakfasts. And New Orleans has benefited through hundreds of millions of dollars in economic activity and tax revenue, driven by the tourism and cultural exchange that short-term rentals facilitate.  In 2023, Airbnb guests in Louisiana contributed approximately $821 million in annual economic activity and $270 million in total tax revenue, and they supported approximately 11,000 jobs.

4.    Yet, beginning in 2016, New Orleans started a campaign to take away homeowners' longstanding and fundamental property rights.  Most recently, in 2023 and 2024, the New Orleans City Council adopted ordinances to further restrict homeowners' rights to lease their homes on a short-term basis.  For example, the 2023 Ordinances cap the number of short-term rentals to one per square block in more than 30 zones.  If multiple homeowners on the same square block apply for a license, they are left to a lottery to determine which one of them can lease their home and tap into the full value of their property.  By limiting short-term rentals to one per square block, the City forces neighbors into conflict over who can exercise their fundamental property rights.  And, if a home is located on a block with an existing bed-and-breakfast or in the French Quarter, the homeowner is deprived of even a chance at short-term leasing.  Moreover, if the homeowner has another unit that is

being used as a short-term rental, he may not exercise his fundamental property rights at the second location.

5.    The City did not stop there.  For the few who are permitted to rent their property short-term, the 2023 Ordinances regulate how the property can be used and impose burdensome and arbitrary requirements.  For example, the City discriminates against out-of-state homeowners by requiring an on-site operator for any short-term rental, making short-term rentals logistically and economically impossible for most out-of-state homeowners.  The City has also delegated discretion to suspend or revoke short-term rental licenses to hearing officers without limitation or guidance, created a private right of action to pit neighbors against each other, added far-reaching requirements for hosting (*e.g.*, mandating that "[beds]heets must be of sufficient width and length . . . and be turned under the mattress so as to properly secure the sheet"; requiring that hosts "resolve complaints within one hour" of being contacted by neighbors, guests, or the City; and prohibiting "offensive odors," whatever the hearing officer might think that means), and devised harsh penalties to enforce these unconstitutional restrictions.  Taken together, the 2023 Ordinances systematically strip homeowners of their right to host guests in their homes.

6.    The 2023 Ordinances are as unlawful as they are misguided.  The restrictions violate the Takings Clauses of the U.S. and Louisiana Constitutions by preventing Host Plaintiffs and other homeowners from exercising their fundamental

right as property owners to lease their property to short-term guests and realize the full value of their homes.  The restrictions violate the Due Process Clauses of the U.S. and Louisiana Constitutions because they are not rationally related to a legitimate government interest, much less necessary to achieve a compelling interest, and they deprive hosts of their rights to lease, to use and control their property, to associate freely, and to privacy in their homes.  Moreover, the restrictions are unconstitutionally vague, including because they impose arbitrary and vague requirements on hosts and provide hearing officers unlimited and unguided discretion to revoke and suspend short-term rental licenses.  And they impermissibly regulate the private civil relationship between Airbnb and hosts and between hosts and guests, in violation of the Louisiana Constitution.

7.    Following enactment of the 2023 Ordinances, the City on October 10, 2024, adopted Ordinance No. 30074 M.C.S., which imposes onerous regulations on short-term rental platforms such as Airbnb.  It is equally unlawful.  As of March 1, 2025, since extended to June 1, 2025, platforms must police short-term rental registration eligibility—even before those properties are listed—and assess whether the host who published the offered rental complied with the registration requirements.  The 2024 Ordinance shifts the burden of enforcing registration requirements from the City to platforms, and it improperly deputizes them as enforcers of the City's ill-conceived ordinances.  In doing so, the City treats

5

platforms as publishers of third-party content in violation of the Communications Decency Act.

8.     The 2024 Ordinance also requires platforms to turn over to the government monthly reports containing confidential, sensitive, and private data concerning Airbnb's business, hosts, and hosts' properties.  The City requires platforms to provide these reports without affording any legal process, or any opportunity for pre-compliance judicial review, in violation of the Fourth Amendment and the Stored Communications Act.  Moreover, the City requires Airbnb to comply with subpoenas seeking onerous categories of data, including data that Airbnb is prohibited from disclosing under the Stored Communications Act.

9.     The 2024 Ordinance infringes on Airbnb's constitutional rights in other ways.  It tramples on Airbnb's First Amendment rights, including by restricting and restraining Airbnb's speech, and impermissibly compelling Airbnb's speech to the City, through the monthly disclosure and verification requirements.  And it takes Airbnb's property without just compensation by requiring Airbnb to name the City as an insured on its commercial general liability insurance policy.

10.     Plaintiffs seek declaratory relief, injunctive relief, and just compensation to remedy the City's constitutional violations and to protect the rights of homeowners and short-term rental platforms.

## PARTIES

11.    Plaintiff Bret Bodin is a natural person 64 years of age and a long-time resident of New Orleans, Louisiana.  Mr. Bodin owns a home with his partner, Brad Newell, in the Tremé neighborhood of New Orleans (the "Bodin/Newell Home").

12.    Plaintiff Brad Newell is a natural person 47 years of age and a long-time resident of New Orleans, Louisiana.  Mr. Newell owns the Bodin/Newell Home with his partner Mr. Bodin.

13.    Plaintiff Darian Morgan is a natural person 32 years of age and a resident of New Orleans, Louisiana.  Mr. Morgan owns a home in the Mid-City neighborhood of New Orleans.

14.    Plaintiff Michael Rosas is a natural person 40 years of age and a resident of New Orleans, Louisiana.  Mr. Rosas owns a triplex in the Carrollton neighborhood of New Orleans.

15.    Plaintiff Mid-City Mike Rentals LLC ("Mid-City Mike") is a Louisiana limited liability company owned by Mr. Rosas.  Mid-City Mike owns a duplex in the Mid-City neighborhood of New Orleans.

16.    Plaintiff Airbnb is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in San Francisco, California.  Airbnb provides an online marketplace that allows individuals who wish to offer accommodations, known as "hosts," the opportunity to connect with

individuals seeking to book accommodations, known as "guests." Airbnb is proud to have enabled New Orleans hosts, despite the unlawful obstacles imposed by the City, to welcome hundreds of thousands of guests to the New Orleans area.

17.    Defendant City of New Orleans is a political subdivision of the State of Louisiana and a municipal corporation organized under the laws of the State of Louisiana and the Home Rule Charter of the City of New Orleans. The City enacted and enforces the ordinances challenged in this action.

## JURISDICTION AND VENUE

18.    This action is brought pursuant to 42 U.S.C. § 1983; the Takings Clause of the Fifth Amendment to the U.S. Constitution; the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution; the Due Process Clause of Article I of the Louisiana Constitution; Article I, Section 4 of the Louisiana Constitution; Article VI, Section 9A, of the Louisiana Constitution; the First Amendment of the U.S. Constitution; the Fourth Amendment of the U.S. Constitution; Article I, Section 2, of the Louisiana Constitution; the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq*.; the Communications Decency Act, 47 U.S.C. § 230; and the Declaratory Judgment Act, 28 U.S.C. § 2201. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), 1367.

19.    This Court has personal jurisdiction over the Defendant, a municipality conducting business in this judicial district.

8

20.    Venue is proper in this Court because a substantial part of the events giving rise to this action occurred, and will continue to occur, in this judicial district; because the properties that are the subject of this action are situated in this judicial district; and because the Defendant resides in this judicial district.

## FACTUAL ALLEGATIONS

## RIGHT TO LEASE

**A.    The Deeply Rooted Tradition of the Right to Lease.**

21.    The right to lease one's home has long been a core property right. Indeed, the practice of leasing one's property to others predates the founding of this country. Roman law—the civilian tradition upon which the Louisiana legal system was founded—recognized leasing as part of a property owner's right to make productive use of their land. *See* Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335, 348 (2017). And under the common law, property owners sold each other "uses," allowing owners to convey property temporarily to another person who would care for and manage it. Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tulane L. Rev. 1139, 1140 (1996).

22.    The founding generation and the legal philosophers and scholars who preceded them conceived of property rights as a "bundle of sticks—a collection of individual rights which, in certain combinations, constitute property." *United States v. Craft*, 535 U.S. 274, 278 (2002) (internal quotation marks omitted). These rights include both property-based prerogatives, such as the authority to put one's property

to productive uses and to include and exclude others from one's land, and liberty interests associated with property ownership, such as the rights to privacy and of association.

23.    Americans in the early Republic routinely turned to leasing and hosting arrangements in the housing context. *See* Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern "Sharing Economy": Are Short-Term Rental Restrictions an Unconstitutional Taking?*, 42 Hastings Const. L.Q. 557, 561-63 (2015) (detailing the practice of early Americans using their homes to host boarders on a short-term basis); *Pelletreau v. Jackson ex dem. Varick*, 11 Wend. 110 (N.Y. Sup. Ct. 1833) (discussing rental property let to tenants beginning around 1782 or 1783); *Herbert v. Wren*, 11 U.S. (7 Cranch) 370 (1813) (describing rents earned from property leased in 1794); *Alexander v. Harris*, 8 U.S. (4 Cranch) 299 (1808) (pertaining to a landlord's action to recover rent); *Faw v. Marsteller*, 6 U.S. (2 Cranch) 10 (1804) (adjudicating a debt action to recover rent under a 1779 lease).

24.    Over the course of the nineteenth century, the leasehold grew in significance as American law recognized the importance of this property interest, particularly the right to lease over short terms. *See, e.g.*, *Reeves v. Dougherty*, 15 Tenn. (7 Yer.) 222 (1834) (noting that a building lessee also boarded with the defendants via a weekly tenancy); *Jackson ex dem. Russell v. Rowland*, 6 Wend. 666

(N.Y. Sup. Ct. 1831) (noting that a dwelling-house tenant held a weekly tenancy); *Curley v. Dean*, 4 Conn. 259 (1822) (discussing a weekly tenancy).

25.    The Takings Clause, added to the U.S. Constitution as part of the Bill of Rights, enshrined protections for property rights like the right to lease.  The evidence from early America demonstrates that the Founders had in mind the right to lease—among other property rights—when they framed the protection of "private property" in the Takings Clause.  *See Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023) (courts "draw[] on existing rules or understandings about property rights" when interpreting and applying the Takings Clause, such as "traditional property law principles" and "historical practice." (internal quotation marks omitted)).

26.    The right to lease serves as a primary means for owners to exercise their fundamental right to choose who may or may not enter on their property.  The Supreme Court's recent decision in *Cedar Point Nursery v. Hassid* underscored that the Takings Clause's protections apply whenever the government appropriates a fundamental property right, like the right to lease.  *See* 594 U.S. at 150.  There, the Court emphasized that "[t]he right to exclude is one of the most treasured rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Id.* (internal quotation marks omitted).  It thereby  reaffirmed  the  well-established  takings  principle  that  government

regulations that interfere with a property owner's exclusion right constitute a per se physical taking—entitling the property owner to just compensation. *Id.*

27.    The decision that property owners make as gatekeepers of their property implicates another fundamental right of property ownership: the right to include. To say that property owners have a right to "exclude" others from their property means that they equally have a right to decide which individuals to "include" on their property. The right to include is inseparable from the right to exclude: both are necessary to assure that the property owner, not the government, decides who comes onto their property.

28.    Those rights are at their apex when the property is a home. There is a long constitutional tradition recognizing the home as a sanctuary, one where privacy, autonomy, and free association enjoy the utmost protection. *See Payton v. New York*, 445 U.S. 573, 601 (1980) (observing that "the overriding respect for the sanctity of the home" traces back to the "origins of the Republic").

29.    The freedom to associate assured by the First Amendment and the freedom from unreasonable incursions on privacy protected by the Fourth Amendment thus bolster homeowners' right to lease their homes. Indeed, these protections were included in the Bill of Rights to preserve the sanctity of the home from oppressive governmental intrusions. Courts recognize that the home is a space where Americans are free to associate with those whom they choose, and where

owners and guests are similarly entitled to reasonable expectations of privacy. *See*

*Minnesota v. Olson*, 495 U.S. 91, 95-100 (1990).

30.    Hosting also promotes freedom of travel and equal opportunity, consistent with constitutional principles. Since the Founding, short-term leasing has supported the enduring American interest in binding together a diverse country. And short-term hosting has long facilitated low-cost travel for all Americans, including those who have historically faced exclusion from desirable destinations. *See, e.g.*, Emily M. Speier, Note, *Embracing Airbnb: How Cities Can Champion Private Property Rights Without Compromising the Health and Welfare of the Community*, 44 Pepp. L. Rev. 387, 392 (2017) (emphasizing the importance of short-term boarding as a "realistic option" for low-income guests and workers).

31.    Louisiana shares in this long tradition of property rights in the home and the practice of short-term leasing. The Louisiana Constitution guarantees "the right to acquire, own, control, use, enjoy, protect, and dispose of private property," La. Const. art. I, § 4, and includes a takings clause that is even more expansive than its federal counterpart. The Supreme Court of Louisiana recognized nearly a century ago that "the right to lease one's own property may be regarded as an incident of ownership" that receives full constitutional protections afforded to other property rights. *State v. City Sav. Bank & Tr. Co.*, 127 So. 890, 891 (La. 1930). Short-term leasing has been included in that right for more than a century. *See, e.g.*, Rand,

13

McNally & Co., A Guide to New Orleans and the Principal Cities in the South 70 (1886) ("Rooms [in New Orleans] are furnished all the way from elegance to bare comfort, and vary in price accordingly.  The favorite method is to rent them by the month or half month, and those who wish them for a few days must pay higher terms proportionately."  (emphasis deleted)); *Barrere v. Shuber*, 5 La. App. 67, 68 (La. Ct. App. 1926) (property owner sought damages where defendant caused her "absence from her house [and] she [therefore] lost the opportunity of renting two rooms at five dollars per week"); *Thompson v. Moran*, 19 La. App. 343, 344 (La. Ct. App. 1932) ("[P]laintiff had been occupying a room in defendant's premises, paying a rental of $1 per week."); *Butler v. Jones*, 21 So.2d 181, 182 (La. Ct. App. 1945) ("The defendant . . . was the owner of the property . . . in the city of New Orleans.  He lived in three rooms of these premises and rented the other rooms by the week to various tenants."); *Muller v. Reynolds*, 26 So.2d 498, 498 (La. Ct. App. 1946) (two rooms in a "residence" were rented for "four days, at a rate of $3 per day"); *Blanchard v. Kemp*, 51 So.2d 639, 640 (La. Ct. App. 1951) (property owner "rented two of the three rooms" of his residence "to two roomers, at a weekly rental"); *Figenschue v. Mitchell*, 54 So.2d 353, 353-54 (La. Ct. App. 1951) ("[P]laintiff established her residence in Mrs. Mitchell's home. Defendant testified that the amount of the room rent was $10 per week . . . .").

32.    An unbroken tradition of using property for short-term rentals has continued into the modern era.  Short-term leasing has flourished and is advanced today by internet-based services like Airbnb.

33.    This tradition is part of what it *means* to own a home in the United States.  New Orleans' effort, including through the 2023 and 2024 Ordinances, to sweep away centuries-old property usages targets fundamental liberties protected by both the U.S. and Louisiana Constitutions.

**B.    The Benefits of Short-Term Rentals.**

34.    Short-term rentals create demonstrable economic benefits for hosts, while generating enhanced choices for consumers and economic value for the New Orleans community.

35.    *First*, short-term leasing arrangements allow homeowners to generate essential income by unlocking the value of their land and allowing them to remain in their homes despite rising homeownership costs, consistent with the fundamental right to devote one's property to economically beneficial use.  In a survey of hosts in the New Orleans metropolitan area, approximately 60% said the income earned through hosting has helped them stay in their home, and approximately 80% use hosting income to cover rising living costs.  Keeping 97% of what hosts charge for their listing, a typical host on Airbnb in the New Orleans area earned $16,000 in 2023 from short-term rentals.

36.    *Second*, hosting strengthens local economies and contributes to the cultural richness New Orleans is known for, fostering the free exchange of associations and ideas that is inevitably sparked when travelers visit and experience the City's soul, liveliness, and generosity.  In 2023, Airbnb guests in Louisiana contributed $821 million in economic activity, including more than 11,000 jobs supported.  Tourism is critical to the New Orleans economy, while restrictions on short-term rentals "reduce the tourist traffic to New Orleans and harm those (other than hoteliers) whose livelihoods depend on providing goods and services to tourists," including employees and owners of bars, restaurants, and entertainment venues.  Michael A. Salinger et al., Charles River Associates, Short-Term Rentals in New Orleans 2 (2023).  And unlike hotels, which tend to be clustered in a handful of neighborhoods, listings on Airbnb are located in a wide range of neighborhoods, including those that do not typically benefit from tourism.

37.    *Third*, short-term rentals benefit New Orleans by generating tax and fee revenue, including short-term rental occupancy fees, sales tax, short-term rental equalization occupancy tax, hotel occupancy privilege tax, and short-term rental application and license fees.  *See STR Taxes, Fees, and Fine*, City of New Orleans, https://nola.gov/str-taxes-and-fees/.  In Louisiana, hosts on Airbnb generated $270 million in total tax revenue in 2023 alone.

38.    *Fourth*, hosting benefits consumers by providing additional lodging options—supporting consumer choice, affordability, and competition.  This can be especially important for those in need of flexible housing (*e.g.*, people encountering life transitions, families whose relatives are in health care facilities, disaster victims, and essential workers).  Hosting also provides important "surge capacity" for special events that significantly contribute to New Orleans' economy like the Super Bowl, Mardi Gras, and Jazz Fest.  A recent article estimated that in ten major U.S. cities, "consumer surplus," that is, the improvement in consumer welfare from having more options at lower prices, "would decrease by $305 million" in one year without Airbnb.  Chirara Farronato & Andrey Fradkin, *The Welfare Effects of Peer Entry: The Case of Airbnb and the Accommodation Industry*, 112 Am. Econ. Rev. 1782, 1785 (2022).

### C.    The City Has Progressively Imposed Limits on Short-Term Rentals Through Unconstitutional Regulatory Schemes.

39.    Though the right to lease is a fundamental property right, and provides enormous benefits to homeowners, consumers, and the City alike, New Orleans has steadily worked to regulate short-term rentals in onerous and discriminatory ways that destroy the fundamental property rights of homeowners.

40.    In December 2016, the Council of the City of New Orleans ("City Council") amended the Code of the City of New Orleans ("Code") and the City's Comprehensive Zoning Ordinance ("CZO") to limit short-term rentals.    The

amendments defined short-term rentals as rentals of all or a portion of a given residential dwelling unit for less than 30 consecutive days. Among other restrictions, the amendments required licenses for short-term rentals, limited whole-home short-term rentals in residential zones to 90 days per year, and banned all short-term rentals in most of the French Quarter. Those amendments went into effect on April 1, 2017. *See* Archived Code of the City of New Orleans, La., Sec. 26-613 *et seq.* (Apr. 28, 2017), https://library.municode.com/la/new_orleans/codes/code_of_ordinances/292015.

41.    The City went further in August 2019, when it again amended the Code and CZO governing short-term rentals to restrict licenses to property owners' primary residences (the "2019 Ordinances"). *See* Archived Code of the City of New Orleans, La., Sec. 26-613 *et seq.* (Dec. 9, 2019), https://library.municode.com/la/new_orleans/codes/code_of_ordinances/353833. In denying non-residents, as well as residents without a homestead exception, the ability to obtain short-term rental licenses, the licensing scheme effectively denied many property owners the right to lease their homes and discriminated against out-of-state property owners.

42.    Property owners sued the City to challenge the 2019 Ordinances and the non-renewal of their short-term rental licenses. On August 22, 2022, the Fifth Circuit put New Orleans on notice that discriminating against out-of-state property owners is unconstitutional by holding that the residency requirement violated the

18

Dormant Commerce Clause. *See Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 328 (5th Cir. 2022) ("Our conclusion that the residency requirement is discriminatory puts it on death's doorstep"); *id*. at 329 ("The City has many options [to achieve its purported objectives]. But it chose one the Constitution forbids.").

43.    Yet, in 2023, the City Council again enacted ordinances that discriminate against out-of-state residents and appropriate homeowners' fundamental property right to lease their property to short-term guests in violation of the Takings Clause, among other constitutional and statutory violations. Although the *Hignell-Stark* plaintiffs litigated a takings claim, they did so only as to their short-term rental licenses and they did not claim, as Host Plaintiffs do here, that the 2023 Ordinances appropriate homeowners' fundamental property right to lease their property to host short-term guests and therefore constitute an uncompensated taking in violation of the Takings Clause. In addition to Host Plaintiffs' Takings Clause claim, and as discussed below, the 2023 and 2024 Ordinances give rise to a number of new constitutional and statutory claims.

### D.    The City Adopts the Unconstitutional 2023 Ordinances.

44.    On March 23, 2023, the City Council adopted two ordinances amending and reordaining certain sections of the Code and CZO regarding short-term rentals: Ordinance No. 29381 M.C.S. and Ordinance No. 29382 M.C.S. These Ordinances became effective on July 1, 2023.

45.    The 2023 Ordinances impose a range of onerous restrictions that, among other things, (i) preclude all but one lottery winner per square block from renting their properties to short-term travelers; (ii) prevent owners from leasing more than one property as a short-term rental; (iii) limit the ability to lease on a short-term basis to natural persons; (iii) force those few who are allowed to rent properties to do so only if an "operator" resides on the premises; (iv) delegate to City employees virtually unfettered discretion to inspect properties without a search warrant, and suspend or revoke short-term rental licenses; and (v) subject short-term rental owners to extreme requirements for hosting and private rights of action that threaten severe penalties.  *See* Sec. 26-613 *et seq.*  These 2023 Ordinances infringe upon the historical and fundamental rights of hosts to share their home, eliminating the ability to host for all but a very burdened and lucky few.

46.    ***The One-Per-Square-Block Limit***. The 2023 Ordinances take and deprive owners of their property interests by limiting the number of short-term licenses to one per square block, with zero licenses available if the property is in the French Quarter or if there is a bed-and-breakfast on the block.  Because existing short-term rental owners may renew their licenses in most instances, the one-per-square-block limit has the effect of prohibiting most homeowners from leasing their home on a short-term basis.  The differential treatment among homeowners and the

arbitrary differentiation between short-term rentals versus bed-and-breakfasts and other accommodation options is improper and discriminatory.

47.    The City Council did not cite any studies or analyze any data in adopting the one-per-square block limit for short-term rentals.  Instead, the City Council pointed to unsubstantiated concerns about the level of investment in the community by homeowners leasing their properties on a short-term basis, purported community opposition to short-term rentals, and vague references to "commercial repercussions" of short-term rentals.

48.    Notably, the City Council rejected the City's own Planning Commission recommendation to allow four times as many short-term rentals per square block.  The 2023 Ordinances also initially allowed two special exceptions from the one-per-block limitation to be in effect within any square block at one time. But on September 19, 2024, the City Council reversed course and adopted a motion prohibiting any new applications for special exceptions after September 19, 2024 (the "2024 Moratorium").  The 2024 Moratorium caps short-term rentals at one per square block, without exception.

49.    ***The One-Per-Owner Limit***.  The 2023 Ordinances take and deprive owners of their property interests by prohibiting any person from leasing different dwellings on their property to more than one group of short-term rental guests or from owning, in whole or in part, more than one property used as a short-term rental.

For example, the 2023 Ordinances prohibit Mr. Bodin and Mr. Newell from renting both a room in their house *and* the separate carriage house on their property. The 2023 Ordinances also limit Mr. Rosas, who owns and lives in a triplex, to renting only one of the two other units on a short-term basis.

50.    Nothing in law or logic permits the City to prevent owners from putting their property to its most productive use and to force owners to forgo their fundamental right to lease at that location just because they happen to own another property where they also choose to exercise the same fundamental right. That restriction violates bedrock takings principles that the City may not "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645.

51.    ***The Natural Person Requirement***.  The 2023 Ordinances take and deprive owners of their property rights by providing that only natural persons aged 18 or over may own property used as a non-commercial short-term rental. The Ordinances prohibit such ownership, in whole or in part, by a business entity, trust, or any other juridical person.  *See* Ordinance No. 29381 M.C.S. Sec. 26-617(a)(1). That includes LLC structures, which are an extremely common way of assuring that homeowners are not subject to uncapped personal liability. The law thus restricts property owners from enjoying the full use of their property, which includes managing the property through a corporate entity.  *See Burwell v. Hobby Lobby*

22

*Stores, Inc.*, 573 U.S. 682, 707 (2014) ("Protecting corporations from government seizure of their property without just compensation protects all those who have a stake in the corporations' financial well-being.").  For example, Mr. Rosas cannot use as a short-term rental the property he holds through Mid-City Mike, LLC.

52.    ***The Operator Residency Requirement***. The 2023 Ordinances require that an operator reside on any premises being used as a short-term rental, thereby discriminating against out-of-state property owners and stripping owners of their constitutional right to exclude.  *See* Ordinance No. 29381 M.C.S., Sec. 26-619(b)(2). The U.S. Court of Appeals for the Fifth Circuit held in *Hignell-Stark v. City of New Orleans* that the City's 2019 Ordinances discriminated against out-of-state property owners by imposing an owner residency requirement.  The City responded by amending its short-term rental regulations to reimpose essentially the same restriction by requiring that an "operator" reside at the short-term rental property. Like the residency requirement in the 2019 Ordinances, the 2023 Ordinances discriminate against out-of-state owners.  While in-state owners may reside on their property and serve as the operator, out-of-state owners are required, in effect, to hire and pay a third-party operator, who must reside on the short-term rental property. The discriminatory effect is little different from the 2019 Ordinances that have been found to be unconstitutional.

53.    ***The Inspection Provision***.   The 2023 Ordinances permit the City to inspect short-term rentals at their discretion to verify compliance with New Orleans' sprawling short-term rental laws.   *See* Ordinance No. 29381 M.C.S., Sec. 26-618(a)(9).  The law does not require any advance notice, and while hosts and guests are purportedly offered an opportunity to consent to the inspection, that consent is simultaneously undermined with a separate provision that allows owners to avoid inspections if they forfeit their short-term rental permit.   The opportunities for unfairly coercive encounters with city officials under this inspection regime are obvious.  *See Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275-76 (2024).

54.    ***The Delegation of Revocation Decisions***.  The 2023 Ordinances delegate virtually unlimited and unguided discretion to government officers to suspend or revoke short-term rental licenses and to search properties without a search warrant.   Under the 2023 Ordinances, a short-term rental license may be suspended for a term or revoked entirely for violations of the Ordinances or other laws incorporated by the Ordinances.  *See* Ordinance No. 29381 M.C.S., Sec. 26-628(c).  If revoked, hosts may not apply for a license for five years, and the property is ineligible to operate as a short-term rental for five years even if ownership of the property is transferred.  The decision to suspend or revoke a license "shall be at the discretion of the hearing officer based on the severity of the violation and any other mitigating or aggravating circumstances surrounding the violation."  *Id.*  While the

2023 Ordinances make it mandatory to revoke a short-term rental license in certain situations, they expressly provide that these situations are provided "without limiting the situations in which the hearing officer might deem revocation appropriate." *Id.*; Sec. 26-628(d).

55.     The 2023 Ordinances do not otherwise guide or limit a hearing officer's discretion to suspend or revoke a license.  Nor do the 2023 Ordinances describe how a hearing officer should assess or weigh the "severity" of a violation or what constitutes "mitigating or aggravating circumstances" surrounding a violation.  As written, the outcome of a hearing could vary dramatically depending on the assigned hearing officer's personal inclinations or even the officer's mood that day.

56.     ***Extreme Short-Term Rental Requirements and Harsh Penalties***.  The 2023 Ordinances impose stringent requirements to operate a short-term rental and penalties for violations.  As examples, they require hosts to provide floor plans, evacuation plans, and site plans for parking vehicles, to attend training courses, and even go so far as to mandate that "[beds]heets must be of sufficient width and length . . . and be turned under the mattress so as to properly secure the sheet."  Ordinance No. 29381 M.C.S., Sec. 26-617(b), 26-618(a)(6)(c).  The 2023 Ordinances also purport to regulate the condition of interior walls, the lighting of rooms, sounds "louder than a conversational level," and even whether someone's cooking results in "offensive odors," or any "effect that otherwise unreasonably interferes with

neighbors' quiet enjoyment of their properties." Ordinance No. 29381 M.C.S., Sec. 26-618(b)(11). These are just a few of the requirements that manage to be simultaneously incredibly detailed and completely vague.

57.    The 2023 Ordinances impose $500 minimum penalties for each offense (since increased to $1,000), with each day a violation exists constituting a separate and distinct offense, and also authorize injunctive relief and other remedies to compel compliance. *See* Ordinance No. 29381 M.C.S., Sec. 26-629; Ordinance No. 30010 M.C.S., Sec. 26-629. Under the Ordinances, even a small, technical, and inadvertent violation can quickly result in suspension or revocation of a short-term rental license, thousands of dollars in fines, and property liens. The result is that hosts are potentially subject to exorbitant penalties based on standardless, vague, and sweeping requirements.

58.    The 2023 Ordinances view short-term rentals as a suspect activity requiring microscopic regulation, as opposed to the deeply rooted Louisiana property right that they are. The 2023 Ordinances also impose a labyrinth of arbitrary and complex regulations that make it all but impossible for the average homeowner to lease their home—a freedom that has existed and been part of American homeownership since the founding and has a historical pedigree that stretches back much further.

### E.    The 2023 Ordinances Will Not Advance Their Stated Objectives.

59.    To satisfy due process, a law restricting a constitutionally protected right must be rationally related to a legitimate governmental interest.  Where a fundamental right—like the right to lease—is at stake, the law must be narrowly tailored to furthering a compelling governmental interest.  The 2023 Ordinances are not rationally related to a legitimate governmental interest, much less narrowly tailored to furthering a compelling interest.  Though City Council members expressed various motivations for their support of these regulations, the 2023 Ordinances themselves state three main purposes: to (1) "preserve the city's permanent housing stock" and reduce "effects on the availability of affordable housing," (2) create a "level playing field for all parties engaged in the business of providing lodging," and (3) "protect the livability and quality of life of the city's residential neighborhoods."

60.    The City did not identify any evidence that the 2023 Ordinances would advance the stated objectives or any other valid governmental purpose.  Not only are the 2023 Ordinances untethered from any factual justifications, the facts are to the contrary.

      **1.**     **The City Council Offered No Evidence That the 2023 Ordinances Will Preserve the City's Permanent Housing Stock or Reduce the Effects on the Availability of Affordable Housing.**

61.     The primary driver of housing unaffordability is underproduction of housing—not short-term rentals. A *Harvard Business Review* study concluded that "restricting Airbnb is not going to be an effective tool for solving the housing-affordability problems in many U.S. cities." Sophie Calder-Wang et al., *What Does Banning Short-Term Rentals Really Accomplish?*, Harv. Bus. Rev. (Feb. 15, 2024). Another study, from the Milken Institute, likewise concluded that, in California, "[short-term rentals] are not a significant driver of increasing housing unaffordability and availability, which is instead driven by decades of underdevelopment, especially of affordable multifamily units." Alissa Dubetz et al., *Staying Power: The Effects of Short-Term Rentals on California's Tourism Economy and Housing Affordability* 1 (2022).

62.     The recent experience of New York City and its stringent short-term rental regulation, Local Law 18, further demonstrates that these restrictions do not improve either long-term housing inventory or pricing, while having a negative economic and fiscal impact. For example, one study found that after New York City passed Local Law 18, there was no meaningful increase in the supply of long-term rental units or decrease in rents. At the same time, the study estimated that Local Law 18 could result in $2.5 billion less in spending from Airbnb guests, $96 million

less in revenue for New York City and New York State, 21,400 less jobs, and $902 million less in worker earnings. *See* HR&A Advisors, NYC LL18 Impact Study (Oct. 2024), https://news.airbnb.com/new-report-finds-nycs-short-term-rental-law-takes-toll-on-outer-boroughs/.  And Boston found that the removal of short-term rentals did not improve housing costs and resulted instead in a $45 *increase* in rental prices. Mayor's Office of Housing, Short-Term Rentals: 2022 Report to the Boston City Council (June 29, 2022), at https://perma.cc/2E7F-E8SR.

63.    While the New Orleans City Council considered no evidence showing that limiting short-term rentals will improve housing availability or affordability in enacting the 2023 Ordinances, it is a certainty that short-term rentals provide more affordable alternatives to hotels and thereby encourage tourism, and that the significant tax revenue generated from short-term rentals provides funding for affordable housing.

### 2.    The 2023 Ordinances Discriminate Against Short-Term Rentals Rather than "Leveling the Playing Field."

64.    The one-license-per-square-block cap will necessarily tilt the playing field against residential homeowners.  Indeed, the main beneficiaries of the 2023 Ordinances are hotels, with one prominent hotelier stating that without Airbnb, hotels have the "ability to price at maybe what the customer would describe as sort of gouging rates" around large events.  Craig Karmin, *Airbnb Crimps Hotels' Power on Pricing*, Wall St. J. (Sept. 29, 2015, 10:10 AM),

https://www.wsj.com/articles/airbnb-crimps-hotels-power-on-pricing-1443519181.

The 2023 Ordinances decrease competition for temporary lodging and allow hotels to raise prices, to the detriment of consumers. The one-license-per-square block cap also tilts the playing field in favor of bed-and-breakfast businesses because, where there is a bed and breakfast on a regulated block, the 2023 Ordinances prohibit the granting of even one short-term rental license on that particular block. The 2023 Ordinances further tilt the playing field against prospective short-term rental owners by making it near-impossible for new entrants and for out-of-state owners to operate a short-term rental.

### 3. The City Council Offered No Evidence That Short-Term Rentals Disrupt "Quality of Life."

65.    The City put forth no evidence that the 2023 Ordinances will lead to less disruption in local neighborhoods or affect resident quality of life. Indeed, studies have found no evidence that short-term rentals lead to increased noise, traffic, or unruly behavior. While the presence of human beings in any household, regardless of leasehold length, inevitably results in some amount of activity and noise, traffic, and so forth, that is no basis for prohibiting short-term rentals. Such concerns apply broadly to all New Orleans residents, and they can be and are regulated directly through neutral rules applicable to all property owners.

66.    There is also no evidence that short-term rentals create unique or disproportionate levels of concerning behaviors. Studies in fact show otherwise. A

2021 study conducted by the City of Dallas found that "Short-Term Rental properties, at the aggregate level, do not have a negative impact on the surrounding neighborhoods. The data shows that there are a few problematic properties; these are outliers. [Short-term rental] properties are almost indiscernible in the data from non-[short-term rental] residential properties." City of Dallas, Short-Term Rental Data Analysis: An Analysis of the Impact of Short-Term Rental Properties in the City of Dallas 13 (May 3, 2021), https://s3.documentcloud.org/documents/20698898/dallas-str-data-analysis-05032021.pdf. And an eight-week study of short-term rentals and long-term rentals in Charleston, South Carolina, "did not find evidence that the average short-term rental was louder than the average long-term occupied home." David Krauss, *Average Noise Levels Compared in Short-Term Rentals and Long-Term Occupied Homes*, VRMintel (Aug. 6, 2018), https://vrmintel.com/average-noise-levels-compared-in-short-term-rentals-and-long-term-occupied-homes/.

### F.    The City Has Deprived Host Plaintiffs of Their Fundamental Property Rights.

#### 1.    Bret Bodin and Brad Newell

67.    Mr. Bodin and Mr. Newell purchased their home, which includes an upstairs loft and a carriage house, in or around 2013. Mr. Bodin and Mr. Newell purchased their home intending to live in it and to lease the carriage house, and for years, that is what they did. Mr. Bodin subsequently retired from his long career as

a manager of retail stores, with the plan of using the short-term rental income to help support him and Mr. Newell and supplement Mr. Newell's income.

68.    To make the carriage house habitable and more attractive to potential short-term lessees, Mr. Bodin and Mr. Newell invested substantial capital into improving it, including refurbishing rotted wood; replacing exterior siding; installing new windows, drywall, flooring, appliances, and air-conditioning; and adding updates to the electrical and plumbing systems (in both the main house and the carriage house).

69.    Between 2015 and the passage of the 2023 Ordinance, Mr. Bodin and Mr. Newell obtained a series of short-term rental licenses for the loft and the carriage house, and they had regular bookings.  Mr. Bodin and Mr. Newell relied on the income from the loft and carriage house short-term rentals to afford living costs, including the ever-rising tax and insurance burdens faced by many homeowners in New Orleans.

70.    The City last issued a short-term rental license for the carriage house in February 2023; that license expired on February 16, 2024.  Under the 2023 Ordinances, Mr. Bodin and Mr. Newell are ineligible to lease their carriage house on a short-term basis—both because they are already leasing their loft and are not permitted to possess more than one short-term rental license, and because of the one-license-per-block limitation.

71.    Absent the 2023 Ordinances, Mr. Bodin and Mr. Newell would continue listing both the loft and the carriage house for rent on a short-term basis. By preventing Mr. Bodin and Mr. Newell from listing the carriage house for rent on a short-term basis, the 2023 Ordinances have caused, and continue to cause, Mr. Bodin and Mr. Newell to lose significant income and have prevented them from leasing their home and otherwise including and excluding others as they choose.

72.    Mr. Bodin and Mr. Newell use Airbnb to lease their loft and, prior to the expiration of their license, the carriage house.  By listing their property on Airbnb, Mr. Bodin and Mr. Newell have shared certain information with Airbnb that they consider to be highly confidential and sensitive, and Airbnb also has generated information that Mr. Bodin and Mr. Newell consider highly confidential and sensitive, including data concerning their income, tax liabilities, volume of business, and level of short-term rental activity.  Mr. Bodin and Mr. Newell do not choose to reveal or turn over this private information to a third party.

### 2.    Darian Morgan

73.    Mr. Morgan moved to New Orleans after graduating from nursing school, and he has lived in the City for approximately six years.  After renting for a couple of years, Mr. Morgan purchased a home in 2020 in the Mid-City neighborhood of New Orleans near his work at University Medical Center New Orleans.  The home has two bedrooms and two bathrooms.  The home includes one

bedroom and one bathroom in the front portion of the home, and the other bedroom and bathroom in the back portion, making it well-suited for a short-term rental.  The home is not well set up for mid-term or long-term rentals, and Mr. Morgan does not wish to use his home that way.

74.    In January 2022, Mr. Morgan acquired a permit to lease his home on a short-term basis, and he began renting the front portion of the home through Airbnb. He improved the home for use as a short-term rental, including by adding a partition between the front and back portions of the home to enhance short-term guests' privacy.  Mr. Morgan also invested in furnishing the short-term rental space to make it more desirable and comfortable for guests.

75.    Mr. Morgan's home is in an attractive location for a short-term rental, and he had regular bookings.  The income from these bookings helped Mr. Morgan to afford living costs, including paying his mortgage, insuring and maintaining his home, and paying taxes.  Mr. Morgan's license expired in January 2023 and he has not been able to obtain a new license.

76.    Mr. Morgan applied twice for the short-term rental lottery.  His first attempt was on or around July 1, 2023, but he lost the lottery to another short-term rental on his block in July 2023.  Mr. Morgan's second attempt was in June 2024. Because there was another home with a short-term rental permit on Mr. Morgan's square block, the 2023 Ordinances and the 2024 Moratorium precluded Mr. Morgan

from participating in the short-term rental lottery and obtaining a short-term rental license for his home.  Mr. Morgan wanted to apply for the short-term rental lottery in January 2025, and even prepared an application for that lottery, but did not submit the application because it would have been futile due to the existing short-term rental home on his block.  Mr. Morgan will be foreclosed from participating in future short-term rental lotteries so long as the other home maintains its short-term rental.

77.     Because of the 2023 Ordinances and the 2024 Moratorium, Mr. Morgan has lost significant income and has been unable to lease his home and otherwise include and exclude others as he chooses.

### 3.     Michael Rosas

78.     Mr. Rosas is a lifelong resident of the New Orleans area, and he manages a coal-storage facility for an energy company.  He purchased a triplex in New Orleans in 2019.  The triplex consists of a 3-bed 2-bath unit on the top floor, a 3-bed 2-bath unit on the bottom floor, and a studio unit also on the bottom floor.

79.     Mr. Rosas purchased the triplex intending to live in the top floor unit, which he has done since 2019, and to lease the two downstairs units short-term.  To make the lower units attractive to potential short-term guests, Mr. Rosas invested substantial capital into improving those units, including adding new paint, windows, flooring, furniture, and appliances, and hiring an interior decorator.

80.    From 2019 until passage of the 2023 Ordinances, Mr. Rosas short-term leased both downstairs units on a near-continuous basis.  Mr. Rosas relied on the income from these short-term rentals to afford living costs and to pay his mortgage.

81.    Because Mr. Rosas is unable to lease both of his downstairs units on a short-term basis under the 2023 Ordinances, he is short-term leasing one and using the studio unit for longer-term rentals which has generated much less income.  He has lost approximately $20,000 per year due to his inability to rent both of his downstairs units on a short-term basis.

82.    If not for the 2023 Ordinances, Mr. Rosas would continue short-term rentals of the studio unit.  By preventing him from doing so, the 2023 Ordinances have caused, and continue to cause, Mr. Rosas to lose significant income and prevent him from leasing his property, and otherwise including and excluding others as he chooses.

83.    Mr. Rosas uses Airbnb to lease his 3-bedroom unit and, prior to the expiration of his license, the studio unit.  By listing his property on Airbnb, Mr. Rosas provides and generates certain information he considers to be highly confidential and sensitive, including data concerning his income, tax liabilities, volume of business, and level of short-term rental activity.  Mr. Rosas does not choose to reveal or turn over this private information to a third party.

### 4.    Mid-City Mike Rentals, LLC

84.    Mid-City Mike Rentals, LLC purchased a duplex in New Orleans in December 2024.  The duplex consists of two two-bed one-bath units.  Mid-City Mike purchased the duplex with the hope that it could be rented on a short-term basis.  To make the duplex more attractive to potential lessees, Mid-City Mike invested substantial capital into improving it.

85.    On the same block as the duplex, another property has obtained a short-term rental license.  Under the 2023 Ordinances, Mid-City Mike may not lease the duplex on a short-term basis—both because it is barred from doing so as a corporate entity, which cannot be issued a short-term rental license, and because of the one-per-square-block limitation.

86.    If not for the 2023 Ordinances, Mid-City Mike would lease the duplex on a short-term basis.  By preventing Mid-City Mike from doing so, the 2023 Ordinances have caused, and continue to cause, Mid-City Mike to lose significant income and prevent it both from leasing its property, and from otherwise including and excluding others as it chooses.

## 2024 PLATFORM REQUIREMENTS

## G.    The City Adopts a Platform-Directed Ordinance in 2024 in Violation of Constitutional and Statutory Law.

87.    Following the enactment of the 2023 Ordinances, the City took additional steps to restrict the market for short-term rentals, this time by imposing

onerous regulations on short-term rental booking *platforms* in a manner that violates the Constitution and federal statutes.  On October 10, 2024, the City Council adopted Ordinance No. 30074 M.C.S., imposing burdensome new verification requirements with a short timeline for compliance, compelling some speech while prohibiting other speech, and obligating platforms to turn over troves of sensitive business data to the City starting March 1, 2025 (since extended to June 1, 2025).

88.    Under the 2024 Ordinance's burdensome framework, "[n]o platform may collect a fee or anything of value in exchange for [facilitating] any booking transaction for a short-term rental . . . that is not in compliance with" the Code, including the 2023 Ordinances.  Sec. 26-622(a)(1).

89.    The 2024 Ordinance shifts the City's law enforcement role onto platforms, requiring them to affirmatively "verify the legal eligibility of each [short-term rental] booking transaction they facilitate" through the City's electronic verification system.  Sec. 26-622(a)(4).  This verification system will purportedly be capable of confirming that a given listing is sanctioned by the City, and will provide the booking platform with a confirmation code as proof of verification.

90.    The 2024 Ordinance states that platforms must verify the registration status of each listing (1) "before the listing is published" and any booking occurs, (2) at least every 30 days after the previous verification, and (3) "whenever [they] know[] or should know that any data [they] used to complete the most recent

verification has changed, including but not limited to the host's name and the address of the listing." Sec. 26-622(a)(4).  Moreover, the 2024 Ordinance requires platforms to remove listings of unsanctioned short-term rentals.  In other words, the 2024 Ordinance imposes penalties on Airbnb for the actions taken by its users on its platform.

91.    Not only is this scheme at odds with the relationship between Airbnb and its users, but it also contravenes constitutional and statutory law.

92.    The 2024 Ordinance further requires booking platforms to submit a monthly report to the Department of Safety and Permits with sensitive business data, including the total number of short-term rental and Exempt Lodging Business[1] properties rented during the reporting period, the number of bookings for each short-term rental, the dates of rental, the amount of rent paid for each short-term rental booking, and the taxes and fees collected and paid by Airbnb for each booking (collectively "Monthly Report Data").  Sec. 26-622(a)(6).  Moreover, platforms must disclose hosts' names, their addresses, and their listings' unique identifiers when submitting verification requests, and the Ordinance states that the City must retain this information even after verification has occurred—this amounts to an additional

---

[1] "Exempt Lodging Business" is defined as "a bed-and-breakfast, hotel, timeshare, or other transient lodging business permitted under the Comprehensive Zoning Ordinance and holding a valid occupational license which is not required by law to obtain a short-term rental permit."  Sec. 26-614.

disclosure requirement, to occur at least every 30 days along with listing verifications.   Sec. 26-622(a)(5).   This information is highly confidential and sensitive for Airbnb because it is non-public information that is important to managing Airbnb's business, which if publicly disclosed would hurt Airbnb's competitive position in seeking hosts to list on its platform.   Much of the Monthly Report Data is also confidential and sensitive to hosts because it is non-public information about the use of their homes (*e.g.*, dates during which the short-term rental was booked), which discloses financial information as well as information about when their homes are vacant during the month.

93.    This highly burdensome monthly reporting requirement contravenes Airbnb's reasonable expectation of privacy under both the Fourth Amendment's protection against unreasonable searches and seizures and the First Amendment's prohibition against compelled speech, as well as hosts' privacy interests in the non-public personal information they disclose to Airbnb.   The 2024 Ordinance does not require the City to issue any kind of legal process to obtain this data, nor does it provide booking platforms with any recourse to challenge this compulsory data disclosure before a judge or any other neutral arbiter.

94.    The 2024 Ordinance also allows the City to obtain *additional* categories of highly confidential and sensitive data upon issuance of a subpoena, including personally identifiable information regarding Airbnb hosts, such as host names and

addresses; the dates and durations of short-term rentals or Exempt Lodging Business stays booked through the platform; and the number of guests included in a booking (collectively "Subpoena Data"). *See* Sec. 26-622(a)(7).

95.    The 2024 Ordinance is not just sweeping in scope; it also creates a highly punitive enforcement regime.  Any platform that violates the short-term rental provisions of the City Code, as amended by the 2024 Ordinance, is subject to a fine of "not less than" $1,000 for each offense.  Sec. 26-629(a).  Moreover, "[e]ach day that such violation exists shall constitute a separate and distinct offense," and any violation of the Code could result in the suspension or five-year revocation of a platform's license.  Sec. 26-629(a), (d).  The City is permitted to "seek all available relief" and "seek any remedy to compel compliance with the requirements" of the Code and Comprehensive Zoning Ordinance.  Sec. 26-629(b), (c).

**H.    The 2024 Ordinance Unlawfully Requires Airbnb to Perform the City's Law Enforcement Obligations.**

96.    The 2024 Ordinance will harm Airbnb, in violation of federal law, by fundamentally altering the nature of the Airbnb platform and holding Airbnb liable for registration of listings posted by its users, enlisting Airbnb to perform the City's law enforcement obligations of verifying the registration status of each listing, and requiring Airbnb to disclose highly confidential and sensitive data to the City without appropriate legal process.

97.    In enacting the 2024 Ordinance, Councilmember Morrell stated that the law's intended purpose was to "prevent" unsanctioned short-term rentals "from being listed" and "continually relist[ed]." J.P. Morrell, Remarks at the New Orleans City Council Meeting at 3:03:00 - 3:05:08 (Oct. 10, 2024), https://cityofno.granicus.com/MediaPlayer.php?view_id=7&clip_id=4951.    In placing the responsibility for achieving this purpose onto platforms, the 2024 Ordinance improperly shifts what should be a government function—monitoring and verifying the registration status of rental listings—onto Airbnb. It is the government's job to enforce its laws, not Airbnb's.

98.    Airbnb is an internet platform and marketplace that connects hosts and guests.  Hosts, not Airbnb, are solely responsible for creating and populating their listings on Airbnb, and hosts and guests alone, not Airbnb, decide whether and on what terms to enter into transactions.  Host listings typically include a description of the property, images and/or videos, pricing information, and dates of availability. While public listings include the property's general location and the host's first name, full address and host name information is not included.  This protects the safety and privacy of hosts and guests.

99.    When guests and hosts access their profiles on Airbnb, they are able to access a variety of data stored by Airbnb on their behalf, including information about past and upcoming bookings, old and current messaging threads, and user reviews.

Guests may correspond with the hosts via Airbnb's messaging tool, and send a booking request to the host or, for an "instant book" listing, confirm and pay for the booking instantly. Guests also pay for their bookings electronically through Airbnb's secure payment processing service. Hosts expect that their confidential records will be used only for the limited purposes outlined in Airbnb's policies, and Airbnb protects these privacy interests so that hosts will continue to have confidence in Airbnb's platform.

100.   If the 2024 Ordinance goes into effect, it would irreparably harm Airbnb. The Ordinance's verification requirement would meaningfully alter the relationship between Airbnb and its users, changing Airbnb from an internet marketplace that connects hosts and guests to a quasi-governmental enforcer of New Orleans' short-term rental ordinances.

101.   In order to fulfill the law-enforcement obligations the City is seeking to impose on the company, Airbnb would have to devote time and resources to verify and re-verify that all hosts are registered to list in New Orleans. The 2024 Ordinance would directly require Airbnb to exclude or take down listings that do not satisfy the City's verification requirements. The result is direct regulation of the content and speech on the Airbnb platform in violation of the First Amendment and Communications Decency Act. Taking on the role of New Orleans' quasi-

governmental enforcer will also cost Airbnb the goodwill of its users in and beyond the City.

*    *    *

102.  To remedy the repeated and continuing infringement on the constitutional rights of short-term rental hosts and the threatened violation of Airbnb's constitutional and statutory rights as described above, Plaintiffs bring the following claims for relief against the City.

**CLAIMS FOR RELIEF**

**Count 1: Per Se Taking Without Just Compensation**
**Fifth and Fourteenth Amendments of the U.S. Constitution; 42 U.S.C. § 1983**
**(On behalf of Host Plaintiffs.)**

103.  Host Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

104.  The Fifth Amendment to the Constitution of the United States provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.  The Fifth Amendment's prohibition on taking private property for public use without just compensation applies to the States through the Fourteenth Amendment to the Constitution of the United States.

105.  As the Supreme Court has long explained, "[b]y requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be

44

borne by the public as a whole.'" *Sheetz*, 601 U.S. at 273-74 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

106. The Takings Clause's protections are triggered by "per se" takings and regulatory takings.

107. Per se takings occur whenever government interference with property effects "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). For per se takings, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point*, 594 U.S. at 147.

108. The test in the regulatory-takings context, by contrast, involves balancing several "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id*. at 148. But the *Penn Central* balancing test has "no place" when the government "appropriates for the enjoyment of third parties" "a fundamental element of the [owners'] property right," *id.* at 149-50, or "otherwise interfere[s] with [such fundamental] right[s]," *Sheetz*, 601 U.S. at 274. "That sort of intrusion on property rights is a *per se* taking" that automatically "trigger[s]" the "right to compensation." *Id.*

109. The 2023 Ordinances and 2024 Moratorium constitute per se takings, as they appropriate fundamental property rights owners hold by virtue of their

property ownership: the right to lease their property and the right to include others on the property on a short-term basis.

110.   As the Supreme Court of Louisiana recognized nearly a century ago in line with states from across the country, "the right to lease one's own property may be regarded as an incident of ownership" that merits full constitutional protection. *City Sav. Bank & Tr. Co.*, 127 So. at 891; *accord Calcasieu Lumber Co. v. Harris*, 13 S.W. 453, 454 (Tex. 1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership."). The Supreme Court thus has long underscored that "the Constitution protects" "the right to . . . lease," which is an "essential attribute[] of property," *Terrace v. Thompson*, 263 U.S. 197, 215 (1923), and is one of the "fundamental rights which are the essence of civil freedom." *Civil Rights Cases*, 109 U.S. 3, 22 (1883).

111.   For homeowners that have previously used their homes as short-term rentals, the loss is particularly stark; they are losing not only a right inherent in homeownership, with a long-established, historical pedigree, but also one that they have actively exercised and that has undeniably vested. *Sawicki v. K/S Stavanger Prince*, 802 S. 2d 598, 604 (La. 2001) ("[A] law cannot be applied retroactively if it impairs contractual obligations or disturbs vested rights."). New Orleans cannot "so

easily manipulate[]" property rights and, by legislative fiat, "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645.

112.   For this reason, the right to lease cannot be appropriated by government action without an award of just compensation. *See United States v. Petty Motor Co.*, 327 U.S. 372 (1946) (formal condemnation action in which the United States sought to utilize a leased building for three years thereby taking the lessee's entire leasehold interest); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) (formal condemnation action in which the United States sought to take occupancy for the remainder of the lessee's lease term); *see also Kohl v. United States*, 91 U.S. 367, 377-78 (1875) (noting that, in a lessee's challenge to a federal condemnation action taking a parcel of land for a courthouse, all owners of estates or interests in the land could seek recovery for the appropriation of their property, but that the court would ascertain the value in one trial proceeding).   In other words, like other "essential sticks in the bundle of rights that are commonly characterized as property," the right to lease—a fundamental incident of ownership in its own right—merits the Takings Clause's protections. *Cedar Point*, 594 U.S. at 150.

113.   Under this case law, the 2023 Ordinances and 2024 Moratorium effect a per se taking by denying certain property owners, like Host Plaintiffs, the right to lease their own property.   Host Plaintiffs intend to lease their properties in New

Orleans to short-term guests but cannot do so due to the per-square-block cap, the natural-person requirement, and the one-per-owner limit on short-term rental licenses. Namely, because of the existence of another owner with a rental on the same block as their properties (in the case of Mr. Morgan), the decision to short-term lease another property that they own (in the case of Messrs. Bodin, Newell, and Rosas), and the ownership of a short-term rental property through an LLC (in the case of Mr. Rosas), New Orleans has denied Host Plaintiffs the ability to create a short-term leasehold interest by exercising their right to lease and offering short-term guests a place to stay. In short, New Orleans has appropriated a fundamental property right, which constitutes a per se taking, and the City owes Plaintiffs just compensation.

114. The 2023 Ordinances and 2024 Moratorium also appropriate Host Plaintiffs' right to include, a corollary of the right to exclude. The right to exclude has received renewed attention in takings jurisprudence. That is because the Supreme Court's recent decision in *Cedar Point Nursery* underscored that the "[t]he right to exclude is 'one of the most treasured' rights of property ownership." *Id.* at 149 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). And the Court has reaffirmed that government regulations that interfere with a property owner's exclusion right constitute a per se physical taking—entitling the property owner to just compensation.

115.  *Cedar Point*'s reasoning extends just the same to the right to include, the exclusion right's direct corollary.  Both are necessary for property owners to act as gatekeepers of their property.  After all, to say that property owners have a right to "exclude" others from their property is just another way of saying that they have a right to decide which individuals to "include" by granting access to the property.  So just as government interference with the right to exclude effects a physical appropriation of a fundamental property right, warranting an award of just compensation under the Takings Clause, government interference with the right to include equally constitutes a per se physical taking and categorically entitles the property owner to just compensation.

116.  The 2023 Ordinances and 2024 Moratorium infringe on Host Plaintiffs' inclusion rights by disallowing them from exercising their right to host guests on their property—the paradigmatic example of exercising the right to include.  Indeed, by permitting only one property owner per block to offer short-term rentals, preventing property owners from managing their properties through the corporate form, and limiting owners to one short-term rental each, New Orleans has destroyed fundamental elements of the vast majority of property owners' rights to include others on their property through the use of the lease.  New Orleans owes just compensation for appropriating these essential sticks in Host Plaintiffs' property rights bundle and thereby effecting a per se physical taking.

117.    If those per se physical invasions were not enough, the 2023 Ordinances further infringe on Host Plaintiffs' Takings Clause-protected right to exclude by mandating that every short-term rental maintain an operator who must reside on the short-term rental property for 24 hours every single day and do so indefinitely, so long as the owner wishes to exercise their fundamental right to lease and right to include others.  Mandating the presence of a third-party who would not otherwise be allowed on the property is a quintessential example of a government appropriation of the owner's right to exclude.

118.    The 2023 Ordinances and 2024 Moratorium unquestionably constitute, several times over, per se takings of Host Plaintiffs' property in violation of the Takings Clause, as incorporated against the State by the Fourteenth Amendment. New Orleans therefore has a categorical duty to provide just compensation to them.

## Count 2: Regulatory Taking
### Fifth and Fourteenth Amendments of the U.S. Constitution; 42 U.S.C. § 1983
### (On behalf of Host Plaintiffs.)

119.    Host Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

120.    In the alternative, the 2023 Ordinances and 2024 Moratorium effect a regulatory taking.  As noted above, to determine whether a regulatory taking has occurred, courts balance the factors set forth in *Penn Central Transportation Co. v. City of New York*: (1) "The economic impact of the regulation on the claimant;" (2)

"the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." 438 U.S. 104, 124 (1978).

121.    First, Host Plaintiffs harbored reasonable, investment-backed expectations about their ability to use their respective properties as short-term rentals.    For example, Mr. Rosas purchased his property and made substantial improvements to it with the expectation that he would be able to rent the two downstairs units on a short-term basis; absent that expectation, Mr. Rosas would not have invested in a triplex.    The same is true of Mid-City Mike's purchase of a duplex with the expectation that the company would be able to use it as a short-term rental property.    Similarly, Mr. Bodin, Mr. Newell, and Mr. Morgan made substantial investments to improve their respective properties with the expectation that these improvements would make the property more attractive for short-term renting.    The Supreme Court has made clear that states cannot "manipulate[]" or "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645. Considering the well-established historical pedigree for property owners leasing their property on a short-term basis and that the right to lease is grounded in Louisiana state property law, these property owners reasonably would not expect

New Orleans to destroy this longstanding use of one's property by legislative fiat, as it has done with the 2023 Ordinances and 2024 Moratorium.

122.   Second, Host Plaintiffs' property values and income-earning potential are substantially diminished from what they would have been but for the enactment of the 2023 Ordinances and 2024 Moratorium.   This accords with the general experience of property owners, who offer short-term rentals precisely because they serve as the principal mechanism for property owners to unlock the full value of their properties.  *See 2023 Short-Term Rental Statistics You Need to Know*, AirDNA (Jan. 28, 2024), https://www.airdna.co/blog/2023-short-term-rental-statistics-key-numbers-to-know (noting that short-term rentals generated approximately $26,000 in revenue per listing in 2023); *see* Ron Bekkerman, et al., *Research: Restricting Airbnb Rentals Reduces Development*, Harv. Bus. Rev. (Nov. 17, 2021), https://hbr.org/2021/11/research-restricting-airbnb-rentals-reduces-development (finding that, of the sample of properties surveyed, those that could offer short-term rentals "sold for an average 38% more than those" that could not, in part because owners were incentivized to invest in improvements).

123.   Third, the government's action is most naturally characterized as effecting a physical invasion of owners' property.  As detailed extensively above, New Orleans's action fits comfortably within the per se takings framework precisely because the 2023 Ordinances and 2024 Moratorium appropriate the owner's

fundamental rights to lease and to include others on the property on a short-term basis, the corollary of the right to exclude.

124.   The 2023 Ordinances and 2024 Moratorium also effect a regulatory taking, for which Host Plaintiffs are entitled to an award of just compensation. However, if the 2023 Ordinances and 2024 Moratorium somehow pass muster under the *Penn Central* test, then the Supreme Court would have no choice but to revisit that test, which is not actually "ground[ed] . . . in the Constitution as it was originally understood." *Murr v. Wisconsin*, 582 U.S. 383, 419 (2017) (Thomas, J., dissenting); *see also Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 141 S. Ct. 731, 731 (2021) (Thomas, J., dissenting from denial of certiorari); *First Eng. Evangelical Lutheran Church v. Cnty. of Los Angeles*, 482 U.S. 304, 340 n.17 (1987) (Stevens, J., dissenting).

### Count 3: Inverse Condemnation
### Article I, Section 4, of the Constitution of the State of Louisiana
### (On behalf of Host Plaintiffs.)

125.   Host Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

126.   The Louisiana Constitution establishes that "[e]very person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power," and it specifies that "[p]roperty shall not be taken or damaged

by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit." La. Const. art. I, § 4.

127. The Louisiana Constitution limits the "public purposes" that would allow a taking to three circumstances: (1) "[a] general public right to a definite use of the property"; (2) "[c]ontinuous public ownership of property dedicated to one" of several enumerated objectives and uses; and (3) "[t]he removal of a threat to public health or safety caused by the existing use or disuse of the property." *Id.* § 4(B). The provision also provides that "[n]either economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose." *Id.* § 4(B)(3).

128. Louisiana courts have interpreted the Takings Clause in the Louisiana Constitution to go "beyond the federal constitution by compensating an owner for the full extent of his loss, rather than only just compensation." *Layne v. City of Mandeville*, 633 So. 2d 608, 611 (La. App. 1st Cir. 1993) (internal quotation marks omitted). Louisiana courts have rejected the notion that a "taking" occurs only "when an owner is denied all economically beneficial use of his property." *Id.* at 612. Rather, the standard formulation is that, under the Louisiana Constitution, "[a] taking has occurred if there has been a substantial diminution in value to such an extent that there has been a destruction of a major portion of the property's value."

*Annison v. Hoover*, 517 So. 2d 420, 423 (La. App. 1st Cir. 1987), *writ denied*, 519 So. 2d 148 (La. 1988).

129.    Under the Louisiana Constitution, "[a] governmental taking may occur in the form of zoning or rezoning." *Standard Materials v. City of Slidell*, 700 So. 2d 975, 984 (La. App. 1st Cir. 1997). The Louisiana courts have articulated a three-part inquiry "[t]o establish a claim for inverse condemnation . . . : (1) a recognized species of property right has been affected; (2) the property has been taken or damaged in a constitutional sense; and (3) the taking or damaging was for a public purpose." *1900 Highway 190, L.L.C. v. City of Slidell*, 196 So. 3d 693, 698 (La. App. 1st Cir. 2016).

130.    The 2023 Ordinances and 2024 Moratorium give rise to a claim for inverse condemnation. The Ordinances and Moratorium affect a vital property right grounded in historical practice and Louisiana state property law: the right to lease property on a short-term basis. By prohibiting short-term rentals for all but a single lottery winner per block—and frequently for no property owner who currently shares a block with a pre-existing bed and breakfast—and by preventing owners from possessing more than one short-term property and limiting such possession to natural persons, the government has taken this property right in a constitutional sense. As a result of the 2023 Ordinances and 2024 Moratorium, property owners may no longer exercise their fundamental rights incident to property ownership.

**Count 4: Violation of Due Process**
**Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983;**
**Article I, Section 2, of the Constitution of the State of Louisiana**
**(On behalf of Host Plaintiffs.)**

131.   Host Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

132.   The Fourteenth Amendment to the U.S. Constitution provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

133.   The Constitution of the State of Louisiana provides that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."  La. Const. art. I, § 2.

134.   The right to lease one's property is a fundamental right "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and internal quotation marks omitted).  The Supreme Court recognized as much in decisions stretching back over 140 years, when it described the right to "lease" as one of the "fundamental rights which are the essence of civil freedom." *Civil Rights Cases*, 109 U.S. at 22.

135.   That the right to lease constitutes a fundamental right is further bolstered by the other constitutional protections afforded to complementary rights that enhance the value of the owner's exercise of the right to lease.  Namely, the

right to exclude and include others on one's property as protected by the Fifth and Fourteenth Amendments, the right to freedom of association as protected by the First Amendment, and the right to privacy in one's home as protected by the Fourth Amendment all work to promote a property owner's ability to unlock the full value of his property and to augment the benefits of his right to lease his property. These guarantees reflect the "sanctity of the home that has been embedded in [this Nation's] traditions since the origins of the Republic." *Wilson v. Layne*, 526 U.S. 603, 610 (1999) (quoting *Payton*, 445 U.S. at 602).

136. Defendant has caused, and will continue to cause, Host Plaintiffs to be deprived of their property without due process of law because the 2023 Ordinances and 2024 Moratorium cap the number of short-term rentals to one per square block and, for blocks containing existing bed-and-breakfasts or in the French Quarter, prohibit short-term rentals entirely; restrict property owners to a single short-term rental, and deprive non-natural persons of any right to short-term rentals.

137. None of these restrictions is rationally related to a legitimate government interest, much less necessary to achieve a compelling government interest. And these restrictions are antithetical to hosts' freedom of association and right to privacy in their homes.

138. The City has not offered any factual basis showing that these restrictions advance the 2023 Ordinances' stated objectives of preserving and

maintaining housing stock and prices, creating a level playing field, or reducing disruption of neighborhoods and enhancing quality of life.  To the contrary, the 2023 Ordinances and 2024 Moratorium will undermine many of these objectives, including by limiting affordable alternatives to hotels, reducing competition for hotel and bed-and-breakfast businesses, reducing new economic opportunities and activity, making homeownership less affordable and accessible, and diminishing tax revenue.  Even if the City's objectives were legitimate, those objectives could be achieved with substantially less intrusion on the property rights of homeowners.

139.  The 2023 Ordinances and 2024 Moratorium subject Plaintiffs to a deprivation of their due process rights guaranteed to them by the U.S. and Louisiana Constitutions.

### Count 5: Void for Vagueness
### Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983; Article I, Section 2, of the Constitution of the State of Louisiana
### (On behalf of Host Plaintiffs.)

140.  Host Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

141.  Under the U.S. Constitution and Constitution of the State of Louisiana, a statute or regulation may not be so vague and indefinite that it amounts to a violation of due process.  A law is unconstitutionally vague if it fails to provide notice sufficient to enable persons of ordinary intelligence to understand what

conduct is prohibited, or lacks specific standards and encourages, authorizes, or fails to prevent arbitrary and discriminatory enforcement.

142.   The 2023 Ordinances impose requirements on hosts that are so vague that persons of ordinary intelligence are unable to discern what conduct is prohibited.

143.   For example, among other vague requirements, the 2023 Ordinances require hosts to ensure that all rooms are "adequately lighted" without providing any standard by which to evaluate compliance.  Ordinance No. 29381 M.C.S., Sec. 26-618(a)(6)(b).  And they require that hosts ensure the operator be able to "resolve complaints" within one hour of being contacted by a neighbor, guest, or the City, without any indication of what constitutes a complaint or adequate resolution.  Sec. 26-618(a)(10)(a).

144.   The 2023 Ordinances also provide that "excessive loud sound," defined as "any noise . . . that is louder than a conversational level"; "offensive odors"; "litter"; or "any effect that otherwise unreasonably interferes with neighbors' quiet enjoyment of their properties" may be grounds for revocation or suspension of a license, yet there are no standards by which to evaluate compliance with these requirements.  Sec. 26-618(b)(11).

145.   Further, the 2023 Ordinances' delegation of the decision to suspend or revoke a short-term rental license to hearing officers is unconstitutionally vague and indefinite.  The 2023 Ordinances grant unlimited discretion over revocation and

suspension decisions.  And these revocation decisions carry on for five years from the determination date and extend not just to the alleged offender, but to any future homeowner of the property for which a license was revoked.  Apart from a non-exhaustive list of situations in which revocation is mandatory, the 2023 Ordinances provide no limitation on a hearing officer's discretion.

146.   The lack of limitations on guidance for the hearing officer's discretion encourages arbitrary and discriminatory enforcement.

147.   The 2023 Ordinances command compliance in terms so vague and indefinite as to invoke no rule or standard at all and/or require compliance with a standard that is substantially incomprehensible.

148.   On their face and as applied, the 2023 Ordinances violate the due process protections of the U.S. and Louisiana Constitutions.

### Count 6: Impermissible Regulation of Private, Civil Relationships
### Article VI, Section 9A, of the Constitution of the State of Louisiana
### (On behalf of Host Plaintiffs and Airbnb.)

149.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

150.   Article VI, Section 9A, of the Constitution of the State of Louisiana provides that "[n]o local governmental subdivision shall . . . except as provided by law, enact an ordinance governing private or civil relationships."

151.   The relationship between Airbnb and hosts is a private, civil relationship, as is the relationship between hosts and their guests. *New Orleans Campaign for a Living Wage v. City of New Orleans*, 825 So. 2d 1098, 1116 (La. 2002); *Hildebrand v. New Orleans*, 549 So. 2d 1218, 1223 (La. 1989).

152.   The 2024 Ordinance regulates the relationship between Airbnb and hosts in violation of Article VI, Section 9A, of the Constitution of the State of Louisiana, including by requiring Airbnb to block certain listings posted by hosts and prohibiting Airbnb from processing certain transactions.

153.   The 2023 Ordinances regulate the relationship between hosts and their guests in violation of Article VI, Section 9A of the Constitution of the State of Louisiana, including by prohibiting some hosts from hosting short-term guests and imposing arbitrary and burdensome requirements on the host-guest relationship. *Javers v. Council of City of New Orleans*, 351 So. 2d 247, 249 (La. Ct. App. 1977), *writ denied*, 354 So. 2d 200 (La. 1978) (proposed landlord-tenant requirements, including regulation of rents and terms of leases, would violate Article VI, Section 9A).

154.   The 2023 and 2024 Ordinances go beyond the City's lawful zoning authority and impermissibly regulate private, civil relationships between Airbnb and hosts and between hosts and their guests.

**Count 7: Warrantless Search and Seizure**
**Fourth Amendment of the U.S. Constitution; 42 U.S.C. § 1983; Article I,**
**Section 5, of the Constitution of the State of Louisiana**
**(On behalf of Mr. Bodin, Mr. Newell, Mr. Rosas, and Airbnb.)**

155.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

156.   The Fourth Amendment of the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment applies to the States by virtue of the Fourteenth Amendment to the U.S. Constitution. The Constitution of the State of Louisiana provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. I, § 5.

157.   Airbnb has a reasonable expectation of privacy in its business records. The Monthly Report Data contemplated by the 2024 Ordinance contains confidential and commercially sensitive information about Airbnb's business. Airbnb takes measures to guard such confidential business information from public disclosure, which is crucial for Airbnb to maintain its business success.

158.   The 2024 Ordinance requires booking platforms to submit a monthly report that includes the total number of short-term rental properties booked during the reporting period, the number of bookings for each short-term rental, the dates of each booking, the rent paid for each booking, and the taxes and fees collected and

paid by Airbnb for each booking. The data requested by the 2024 Ordinance is highly confidential, and Airbnb has a strong privacy interest in this data. To make matters worse, the 2024 Ordinance also compels Airbnb to produce information on an ongoing basis as part of its verification requirements – information that, by the City's own account, would otherwise only be obtained upon issuance of a subpoena.

159. Hosts on Airbnb also have privacy interests in the non-public confidential records maintained by Airbnb concerning their short-term rental property. Hosts expect that their confidential records will be used only for the limited purposes outlined in Airbnb's policies. And Airbnb shares the interests of its hosts in maintaining their privacy, including so that hosts will continue to have confidence in Airbnb's short-term rental platform.

160. The Fourth Amendment also prohibits the government from executing an administrative search unless the subject of the search has "an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015). The 2024 Ordinance violates the Fourth Amendment of the U.S. Constitution and Article I of the Louisiana Constitution because the Ordinance improperly authorizes the City, including through the verification process and through the Department of Safety and Permits, to execute an administrative search of Airbnb's business records and hosts' confidential records without any form of precompliance review.

161.  Further, the 2024 Ordinance raises additional Fourth Amendment problems, as it shifts the City's law enforcement role onto Airbnb by compelling it to affirmatively verify hosts' registration status and to remove listings that Airbnb has found to be out of compliance with the Code.  These provisions allow the City to abdicate its responsibility to enforce its own laws and deputize Airbnb to conduct those policing obligations for the City unconstrained by the Fourth Amendment.  Yet the Fourth Amendment applies to private actors acting under government compulsion, just the same as it limits governmental searches and seizures.  *Skinner v. Ry. Lab. Executives' Ass'n,* 489 U.S. 602, 614 (1989); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

## Count 8: Violation of and Preemption by the Stored Communications Act
## 18 U.S.C. §§ 2701 *et seq.*; 42 U.S.C. § 1983
## (On behalf of Airbnb.)

162.  Airbnb incorporates by reference the allegations set forth above as though fully restated herein.

163.  Under the Stored Communications Act ("SCA"), "a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity," without appropriate legal process.  18 U.S.C. § 2702(a)(3).

164.   Under the SCA, other than six enumerated categories of information not applicable here, a search warrant or court order is required to obtain non-content information about a user absent the user's consent.  18 U.S.C. § 2702(c) (describing the circumstances under which a governmental entity may compel the disclosure of "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications . . . )").  Pursuant to 18 U.S.C. § 2703(d), in order to obtain a court order, the governmental entity must offer "specific and articulable facts showing that there are reasonable grounds to believe that the . . . information sought [is] relevant and material to an ongoing criminal investigation." *Id.* § 2703(d) (punctuation omitted).

165.   Airbnb is a provider of an electronic communication service within the meaning of the SCA, because it provides its users with "the ability to send or receive wire or electronic communications," by, among other things, allowing hosts and guests to privately and securely message each other through the service.  *Id.* § 2510(15).  Airbnb also is a provider of a remote computing service within the meaning of the SCA, because it provides its users "computer storage or processing services by means of an electronic communications system," by, among other things, allowing users to create listings and store photographs, documents, and correspondence.  *Id.* § 2711(2).

166.   The City is a municipality within the State of Louisiana, and thus qualifies as a "governmental entity" under the SCA.  *Id.* § 2711(4).

167.   The 2024 Ordinance violates and conflicts with the SCA because it requires Airbnb to "divulge a record or other information pertaining to a subscriber to or customer of such service" to a "governmental entity" without appropriate legal process.  First, it requires Airbnb to disclose on a monthly basis—with no legal process—information such as the number of bookings for each listing in a given month, the dates during which each listing was booked in a given month, and the amount of rent paid for each booking.  Under the SCA, this type of data can only be disclosed in compliance with a search warrant or court order.

168.   Second, the 2024 Ordinance requires Airbnb to disclose in response to a subpoena information such as dates and duration of each booking and the number of guests included in each booking.  This type of information goes beyond the limited categories of data whose disclosure may be compelled with a subpoena; instead, the SCA demands a search warrant or court order to compel the production of such data.

169.   For the foregoing reasons, the 2024 Ordinance violates and is preempted by the SCA.

### Count 9: Violation of and Preemption by the Communications Decency Act
### 47 U.S.C. § 230; 42 U.S.C. § 1983
### (On behalf of Airbnb.)

170.   Airbnb incorporates by reference the allegations set forth above as though fully restated herein.

171.   In enacting Section 230 of the Communications Decency Act, Congress sought to protect and nurture the internet as a forum for communication, expression, and e-commerce.  Section 230 draws a clear line between the government and websites—it is the government's job to enforce laws, and it is not permitted to impose that law-enforcement role on websites by assigning liability to the website for the actions of its users.  Accordingly, Section 230 prohibits treating websites that host or distribute third-party content, like Airbnb, "as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Section 230 also preempts incompatible state and local laws that would seek to assign liability to platforms.  *Id.* § 230(e)(3).  Congress enacted Section 230 to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce," while "keep[ing] government interference in the medium to a minimum."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003).

172.   Airbnb is a provider of an "interactive computer service" within the meaning of Section 230, because it provides computer access by multiple users to a computer server through its maintenance of the Airbnb platform.  *Id.* § 230(f)(2).

173.   Third-party hosts on the Airbnb platform are "information content providers" within the meaning of Section 230, because they alone are responsible for the creation of listings on Airbnb.  *Id.* § 230(f)(3).  And hosts and guests alone, not Airbnb, decide whether and on what terms to enter into transactions.

174.   The 2024 Ordinance violates and conflicts with Section 230.  By foisting the City's law enforcement role onto Airbnb, the City has imposed liability on Airbnb for the content of third parties, thereby treating Airbnb as the publisher or speaker of information provided by a third-party information content provider.  Specifically, the 2024 Ordinance's verification requirements assign Airbnb the responsibility of carrying out "actions quintessentially related to a publisher's role," including "monitoring" and "screening" to verify that hosts are eligible to list their properties.  *See Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008); *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (citing *Myspace* for the same proposition).

175.   The 2024 Ordinance requires Airbnb to verify the registration status of each listing "before the listing is published," every 30 days thereafter, and whenever Airbnb "should know" that any data relevant to verification has changed, essentially

requiring Airbnb to monitor the registration status of all of its New Orleans listings to identify changes that are potentially material to verification.  By forcing Airbnb to engage in verifying the registration status of a third-party listing, including *before* a listing is posted, the 2024 Ordinance treats Airbnb as a publisher of third-party content in conflict with Section 230.  The 2024 Ordinance runs further afoul of Section 230 by effectively requiring Airbnb to remove listings when it cannot verify that the host is eligible to list the property.

176.   It does not matter if the City attempts to avoid Section 230 by casting Airbnb's liability as flowing from a failure to adhere to the verification requirements, rather than for the content that hosts publish by means of their license number.  As one court within the Fifth Circuit explained in rejecting similar logic:  "Imagine that Texas passed a law stating, 'Social media websites must remove defamatory content.'  [The argument that] the law would not be preempted because liability attaches based on whether a website complies with the law, not based on its content . . . would altogether nullify Section 230 by having the same effect as directly imposing liability on the website for hosting third-party content."  *Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *19 (W.D. Tex. Aug. 30, 2024).  The same principles apply here.

177.   The 2024 Ordinance ultimately seeks to hold Airbnb accountable not for its own actions, but for those of hosts, by regulating and restricting the listings

that appear on Airbnb's platform. This purpose was made explicit by Councilmember Morrell, who stated that the Ordinance will "prevent" unsanctioned short-term rentals "from being listed" and "continually relist[ed]" on booking platforms. J.P. Morrell, Remarks at the New Orleans City Council Meeting at 3:03:00 - 3:05:08 (Oct. 10, 2024), https://cityofno.granicus.com/MediaPlayer.php?view_id=7&clip_id=4951. By directly regulating the third-party content that Airbnb can and cannot publish on its platform, the 2024 Ordinance is treating Airbnb as a publisher and speaker of information provided by a third-party information content provider, in violation of Section 230. *See United States v. eBay Inc.*, 2024 WL 4350523, at *10 (E.D.N.Y. Sept. 30, 2024) ("[A]n interactive computer service will be immune for content on its platform under Section 230 unless it assisted in the development of what made the content unlawful, thus becoming an information content provider," and platforms that provide "administrative and technical support" for transactions between third parties "do[] not materially contribut[e] to [the content's] alleged unlawfulness." (citation omitted)).

178. The 2024 Ordinance is a "State or local law that is inconsistent with" Section 230, in violation of 47 U.S.C. § 230(e)(3), and the enforcement of the Ordinance against Airbnb violates and is preempted by Section 230. Courts have come to the same conclusion with respect to similar laws. *See Smith v. Airbnb, Inc.*,

316 Or. App. 378, 381 (2021) (Section 230 barred claim against Airbnb for "fail[ing] to 'properly vet potential rental listings' on its website"); *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1107 (C.D. Cal. 2017) (Section 230 barred claim where "it [was] with Airbnb's publication of [third-party listings] content that Aimco [took] issue"); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 (D. Mass. 2019) (enjoining law that would have "compel[led Airbnb] to monitor and remove third-party content"); *Donaher v. Vannini*, 2017 WL 4518378, at *2 (Me. Super. Ct. Aug. 18, 2017) (Section 230 bars "claims against Airbnb" for its "decision not to delete a particular posting").

179.    For the foregoing reasons, the 2024 Ordinance violates and is preempted by Section 230.

### Count 10: Impermissible Restriction of Protected Speech
### First Amendment of the U.S. Constitution; 42 U.S.C. § 1983
### (On behalf of Airbnb.)

180.    Airbnb incorporates by reference the allegations set forth above as though fully restated herein.

181.    The requirements in the 2024 Ordinance that platforms verify the eligibility of listings before allowing those listings to be publicly posted impermissibly restricts protected speech.    Specifically, the Ordinance requires Airbnb to "verify the legal eligibility" of each listing "*before the listing is published on the platform*."    New Orleans Code § 26-622(a)(4)(i) (emphasis added).    Whether

this requirement is construed as a prior restraint, a content-based restriction on Airbnb's speech meriting strict scrutiny, or a restriction of only commercial speech, the requirement cannot survive First Amendment scrutiny.

182.   Under even the relaxed level of scrutiny applicable to commercial speech, the City at a minimum must show that the verification requirement directly advances a substantial government interest.  *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571-72 (2011).   Even if the City has a substantial interest in ensuring compliance with its registration requirements, the verification requirement advances that interest in an *indirect* way, by restricting the speech of short-term rental platforms in order to regulate the behavior of short-term rental hosts.   As the Supreme Court has recognized, "[t]he normal method for deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."  *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).

183.   The City can ensure that short-term rental listings are legally eligible through enforcement against the parties engaging in purported illegal activity—hosts who operate rentals without being eligible to do so.  The City has failed to show that this less-speech-restrictive alternative would not be an adequate means of achieving the stated objectives, and its attempt to achieve the same ends by restricting the speech of platforms is unwarranted.  The City may not shift the burden of enforcing a law simply because it wishes to do so.

**Count 11: Impermissible Compelled Speech**
**First Amendment of the U.S. Constitution; 42 U.S.C. § 1983**
**(On behalf of Airbnb.)**

184. Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

185. The First Amendment "guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988).

186. Supreme Court precedent interpreting the First Amendment "distinguish[es] between content-based and content-neutral regulations of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). "Content-based regulations 'target speech based on its communicative content,'" and, "[a]s a general matter, such laws 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

187. Accordingly, when the government "compel[s] individuals to speak a particular message" over their objection, "such notices alter the content of their speech" and therefore trigger heightened scrutiny. *Id.* at 782 (brackets and internal quotation marks omitted); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023) ("Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to

include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." (citations omitted)).

188.   The 2024 Ordinance impermissibly compels Airbnb's speech in two ways.  First, the monthly disclosure requirement forces Airbnb to create and submit monthly reports divulging sensitive business data.   Second, the verification requirement forces Airbnb to identify and then report—via the compelled suppression of rental listings—purported violations of the City's hosting laws against its will.   Airbnb does not wish to engage in the speech that the 2024 Ordinance compels.

189.   The speech that the 2024 Ordinance compels is not commercial speech. As the Supreme Court has explained, commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted).   Neither the sensitive information that Airbnb is required to disclose on a monthly basis nor the suppression of listings that purportedly violate the City's hosting laws propose commercial transactions.

190.   The 2024 Ordinance's unduly burdensome monthly disclosure and verification requirements are content-based regulations because they obligate covered entities to speak on particular topics—*i.e.*, the nine monthly disclosure

categories and whether rental listings satisfy the City's hosting laws—but not others. Accordingly, the monthly disclosure requirement is subject to strict scrutiny.

191. The 2024 Ordinance's monthly disclosure and verification requirements do not satisfy strict scrutiny.  Neither are justified by a compelling government interest, nor are they narrowly drawn to serve any such interest.  No compelling government interest can be served by requiring Airbnb to divulge, on a monthly basis, each of the nine categories of information covered by the data disclosure requirement or to suppress listings that purportedly do not satisfy the City's hosting laws.  And even if the City could identify a compelling interest, there are undoubtedly less restrictive means the City could employ to serve that interest.

192. Several courts have found that laws similar to the 2024 Ordinance violate the First Amendment on compelled speech grounds.  *See, e.g.*, *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *NetChoice v. Bonta*, 2024 WL 5264045 (N.D. Cal. Dec. 31, 2024); *DoorDash, Inc. v. City of New York*, 2024 WL 4276245 (S.D.N.Y. Sept. 24, 2024).

## Count 12: Violation of the Takings Clause
### Fifth and Fourteenth Amendments of the U.S. Constitution; 42 U.S.C. § 1983
### (On behalf of Host Plaintiffs.)

193. Airbnb incorporates by reference the allegations set forth above as though fully restated herein.

194.    The 2024 Ordinance requires Airbnb to maintain a commercial general liability insurance policy "with limits of not less than $1,000,000.00 per occurrence" and to "name the City of New Orleans as an additional insured on a primary, noncontributory basis for any liability arising directly or indirectly from the issuance of the license (if commercially available)."  New Orleans Code § 26-622(a)(2).

195.    Airbnb has a property interest in its insurance policies and the proceeds from them.  *Lynch v. United States*, 292 U.S. 571, 579 (1934).

196.    The City of New Orleans does not compensate Airbnb for naming the City as an additional insured on a primary, noncontributory basis to its commercial general liability insurance policy.  Instead, it has appropriated Airbnb's contractual benefits by acquiring for itself the privileged position of an insured without paying for those contractual rights: a taking of Airbnb's property without just compensation.

197.    Accordingly, by compelling Airbnb to name the City of New Orleans as an additional insured on a primary, noncontributory basis to a commercial general liability insurance policy, the Ordinance effects a taking without just compensation, in violation of the Takings Clause.  *Long Island Water-Supply Co. v. City of Brooklyn*, 166 U.S. 685, 691 (1897).

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully ask that this Court grant the following relief:

(1)   Declare that the 2023 Ordinances and 2024 Moratorium violate the Takings Clause of the Fifth Amendment to the U.S. Constitution; the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution; Article 1, Section 4, of the Louisiana Constitution; Article I, Section 5, of the Louisiana Constitution; the Due Process Clause of Article I of the Louisiana Constitution; and Article VI, Section 9A of the Louisiana Constitution;

(2)   Declare that the 2024 Ordinance violates the First, Fourth, and Fifth Amendments of the U.S. Constitution; the Stored Communications Act; the Communications Decency Act; and Article VI, Section 9A of the Louisiana Constitution;

(3)   Preliminarily and permanently enjoin Defendant from enforcing the 2023 Ordinances and 2024 Moratorium;

(4)   Preliminarily and permanently enjoin Defendant from enforcing the 2024 Ordinance;

(5)   Award just compensation for Defendants' taking of Host Plaintiffs' property in violation of the Fifth Amendment to the U.S. Constitution and Article 1, Section 4, of the Louisiana Constitution;

(6)    Award damages or restitution for Defendant's violation of Airbnb's rights under the U.S. and Louisiana Constitutions, the Stored Communications Act, and the Communications Decency Act;

(7)    Award prejudgment interest at the maximum rate allowable by law;

(8)    Award reasonable attorneys' fees, experts' fees, and other costs and expenses; and

(9)    Grant any other and further relief that this Court may deem just, equitable, and proper.

Dated: February 14, 2025

Respectfully submitted,

Paul D. Clement*
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*/s/ Mark A. Cunningham*
Mark A. Cunningham (La. Bar Roll No. 24063)
Madeline M. Freese (La. Bar Roll No. 40780)
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
(504) 582-8536
mcunningham@joneswalker.com
mfreese@joneswalker.com

Clara J. Shin*
Jeffrey M. Davidson* (T.A.)
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
cshin@cov.com
jdavidson@cov.com

Alexander A. Berengaut*
Chloe Goodwin*
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com
cgoodwin@cov.com

*Attorneys for Plaintiffs*

*\*pro hac vice application forthcoming*