**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BRET BODIN, DARIAN MORGAN, BRAD NEWELL, MICHAEL ROSAS, MID-CITY MIKE RENTALS, LLC, and AIRBNB, INC., <br><br> *Plaintiffs*, <br><br>  v. <br><br> THE CITY OF NEW ORLEANS, <br><br><br> *Defendant*. | Civil Action No. 2:25-cv-00329 <br><br> SECTION: A <br><br> DISTRICT JUDGE: Hon. Jay C. Zainey <br><br> MAGISTRATE JUDGE: Hon. Michael North |

**MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     The Rights to Lease and to Include Others on Property Are Deeply Rooted .................... 3

II.    The City Adopts Onerous Restrictions on Short-Term Rentals ......................................... 4

III.   The 2023 Ordinances Will Not Further the City's Goals .................................................... 5

IV.   The 2023 Ordinances Harm Hosts ..................................................................................... 5

V.    The 2024 Ordinance Illegally Conscripts Booking Platforms in Regulating Short-Term Rentals ..................................................................................................................... 6

ARGUMENT ...................................................................................................................... 8

I.     The Amended Complaint Adequately Alleges that the 2023 Ordinances Are Unconstitutional ................................................................................................................ 8

     A.     The Amended Complaint States a Takings Claim ................................................. 8

           1.     The Amended Complaint Adequately Alleges that the 2023 Ordinances Appropriate a Fundamental Element of the Property Right and Thus Constitute a *Per Se* Taking (Count 1) ............................... 8

           2.     The Amended Complaint Adequately Alleges that the 2023 Ordinances Constitute a Regulatory Taking (Count 2) and a Taking Under the Louisiana Constitution (Count 3) ............................................ 16

     B.     The Amended Complaint States Due Process and Void-For-Vagueness Claims ................................................................................................................. 17

           1.     The Amended Complaint Adequately Alleges that the 2023 Ordinances Violate Hosts' Due Process Rights (Count 4) ....................... 17

           2.     The Amended Complaint Adequately Alleges that the 2023 Ordinances Are Unconstitutionally Vague (Count 5) .............................. 21

     C.     The Amended Complaint States a Claim for Improper Interference with Private, Civil Relationships (Count 6) ................................................................. 22

II.    The Amended Complaint Adequately Alleges that the 2024 Ordinance and Related City Code Provisions Are Unlawful ................................................................... 24

     A.     The Amended Complaint States a Fourth Amendment Claim (Count 7) ............. 25

B.      The Amended Complaint States a Claim Under the Stored
        Communications Act (Count 8) ............................................................ 29

C.      The Amended Complaint States a Claim Under Section 230 (Count 9)............... 31

D.      The Amended Complaint States a First Amendment Claim (Count 10).............. 34

E.      The Amended Complaint States a Takings Claim on behalf of Airbnb
        (Count 11) .................................................................................................... 37

CONCLUSION.................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. Boston*,
  386 F. Supp. 3d 113 (D. Mass. 2019) ..............................................................32, 33

*Airbnb, Inc. v. New York City Mayor's Office of Special Enforcement*,
  2023 WL 5044029 (N.Y. S. Ct. 2023) ................................................26, 27, 28, 33

*Armstrong v. Ashley*,
  60 F.4th 262 (5th Cir. 2023) ...........................................................................8, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................8

*Bode v. Kenner City*,
  303 F. Supp. 3d 484 (E.D. La. 2018) ....................................................................22

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011) .............................................................................................20

*Carpenter v. United States*,
  585 U.S. 296 (2018) .............................................................................................26

*Casitas Mun. Water Dist. v. United States*,
  543 F.3d 1276 (Fed. Cir. 2008) ............................................................................12

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ...................................................................................... *passim*

*City of New Orleans v. Dukes*,
  427 U.S. 297 (1976) .............................................................................................15

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
  747 F. Supp. 3d 1011 (W.D. Tex. 2024) ...............................................................32

*Dep't of State v. Munoz*,
  602 U.S. 899 (2024) .............................................................................................18

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................................................................................13

*Dobbs v. Jackson's Women's Health Org.*,
  597 U.S. 215 (2022) ...............................................................................................9

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ...........................................................................31

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994).........................................................................................12

*Dupart v. Roussell*,
    497 F. Supp. 3d 102 (E.D. La. 2020) ...............................................................36

*In re Facebook, Inc.*,
    923 F. Supp. 2d 1204 (N.D. Cal. 2012) ............................................................30

*First Fidelity Bank v. McAteer*,
    985 F.2d 114 (3d Cir. 1993).............................................................................37

*Gochicoa v. Johnson*,
    238 F.3d 278 (5th Cir. 2000) ......................................................................23, 24

*Hall v. Bd. of Sch. Com'rs of Mobile Cnty., Ala.*,
    681 F.2d 965 (5th Cir. 1982) ...........................................................................21

*Haw. Legal Short-Term Rental All. v. City & Cnty. of Honolulu*,
    2022 WL 7471692 (D. Haw. Oct. 13, 2022) ..................................................2, 14

*Hignell v. City of New Orleans*,
    2024 WL 838217 (E.D. La. Feb. 24, 2024) .....................................................9, 18

*Hignell-Stark v. City of New Orleans*,
    46 F.4th 317 (5th Cir. 2022) ...................................................................2, 4, 19, 20

*Hines v. Quillivan*,
    982 F.3d 256 (5th Cir. 2020) ...........................................................................20

*Homeaway.com v. Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) .................................................................. *passim*

*Homeaway.com, Inc. v. City of Portland*,
    No. 3:17-cv-00091-MO (D. Or. Mar. 27, 2017).................................................30

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015).........................................................................................15

*Int'l Refugee Assistance Project v. Trump*,
    404 F. Supp. 3d 946 (D. Md. 2019)..................................................................21

*Kyllo v. United States*,
    533 U.S. 27 (2001)...........................................................................................25

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ................................................................................18

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ................................................................................37

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) ....................................................................8

*Los Angeles v. Patel,*
    576 U.S. 409 (2015) ................................................................26, 27, 28

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992) ..............................................................................14

*Mathews v. Lucas,*
    427 U.S. 495 (1976) ................................................................................20

*In re McLain,*
    516 F.3d 301 (5th Cir. 2008) ..................................................................37

*Minnesota v. Olson,*
    495 U.S. 91 (1990) ..................................................................................18

*In re Morrison,*
    403 B.R. 895 (Bankr. M.D. Fla. 2009) ..................................................37

*Murr v. Wisconsin,*
    582 U.S. 383 (2017) ...........................................................................1, 17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018) ................................................................................34

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024) ..........................................................35, 36

*Payton v. New York,*
    445 U.S. 573 (1980) ................................................................................18

*Penn Cent. Transp. Co. v. City of New York,*
    438 U.S. 104 (1978) ................................................................................16

*Penn. Coal Co. v. Mahon,*
    260 U.S. 393 (1922) ................................................................................16

*PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.,*
    273 F. Supp. 3d 558 (W.D. Pa. 2017) ....................................................30

*Ralph v. City of New Orleans*,
   4 So.3d 146 (La. Ct. App. 2009)................................................................23, 24

*Reno v. Flores*,
   507 U.S. 292 (1993)................................................................................18, 19

*Reyes v. N. Tex. Tollway Auth.*,
   861 F.3d 558 (5th Cir. 2017) ...........................................................................20

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988)..........................................................................................34

*Rodrigue v. Rodrigue*,
   218 F.3d 432 (5th Cir. 2000) ...........................................................................10

*Schweickert v. Hunts Point Ventures, Inc.*,
   2014 WL 6886630 (W.D. Wash. Dec. 4, 2014) ...............................................30

*Sewell v. Monroe City Sch. Bd.*,
   974 F.3d 577 (5th Cir. 2020) .............................................................................8

*Sheetz v. County of El Dorado*,
   601 U.S. 267 (2024)............................................................................................9

*Simi Inv. Co., Inc. v. Harris County*,
   236 F.3d 240 (5th Cir. 2000) ...........................................................................20

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..............................................................................34, 35, 36

*Stanley v. Georgia*,
   394 U.S. 557 (1965)..........................................................................................18

*State v. City Sav. Bank & Tr. Co.*,
   127 So. 890 (La. 1930) ...................................................................2, 10, 16, 17

*Terrace v. Thompson*,
   263 U.S. 197 (1923)..........................................................................................10

*Tyler v. Hennepin Cnty.*,
   598 U.S. 631 (2023)..................................................................................2, 3, 9

*Union Carbide Corp. v. Alexander*,
   679 S.W.2d 938 (Tenn. 1984)...........................................................................12

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000)..........................................................................................18

*United States v. Warshak*,
  631 F.3d 266 (6th Cir. 2010) ...................................................................................25

*Vill. of Euclid v. Ambler Realty Co.*,
  272 U.S. 365 (1926) ...............................................................................................14

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*,
  945 F.3d 206 (5th Cir. 2019) ...................................................................................20

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ...............................................................................................17

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980) .................................................................................................2

*X. Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) .......................................................................34, 35, 36

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................34, 35, 36, 37

U.S. Const. amend. IV ...................................................................................... *passim*

U.S. Const. amend. V ....................................................................................... *passim*

La. Const. art. I ...................................................................................................16

La. Const. art. VI.....................................................................................22, 23, 24

**Statutes**

18 U.S.C. § 2701 *et seq.*................................................................................29, 30, 31

43 R.C.N.Y. § 22-03 .............................................................................................27

47 U.S.C. § 230.......................................................................................31, 32, 33

Code of the City of New Orleans Sec. 6.................................................................27

Code of the City of New Orleans Sec. 26........................................................ *passim*

Code of the City of New Orleans Sec. 54.................................................................4

La. C.C. Art. 2678.......................................................................................10, 11, 13

**Other Authorities**

Margaret Jane Radin, *Property and Personhood*,
    34 Stan. L. Rev. 957, 992 (1982) ............................................................................................18

Thomas Merrill, *The Character of the Governmental Action*, 36 Vt. L. Rev. 649,
    664 (2012) .............................................................................................................................17

Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 740 n.37,
    742-43 (1998) ........................................................................................................................12

## INTRODUCTION

Plaintiffs' claims are not just plausible, but compelling and correct, and they easily overcome the City's motion to dismiss.  R. Doc. 25.  The Court should deny the City's motion and grant Plaintiffs' motion for summary judgment.  R. Doc. 28.

Since before the founding, property rights in the home have protected and advanced personal freedoms, including the rights of privacy, autonomy, and free association.  Homeownership also supplies crucial economic freedoms, and homeowners have long shared their property and earned income by leasing all or parts of their homes to others, whether for short or long periods.  "Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them."  *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017).   The right to lease property and generate income is what helps many Americans, like the plaintiff homeowners who bring this suit, to achieve home ownership in the first place.  Homeowners in New Orleans have shared in that historical practice for more than a century.  Short-term rentals ("STRs") allow homeowners to unlock the full value of their homes, and they are a manifestation of the broader rights to lease property and to choose whom to include in one's home.

The New Orleans ordinances that Plaintiffs challenge here are a frontal attack on the long-standing tradition of STRs and the property rights of homeowners.  They impose stringent limits on STRs, ban them altogether for many homeowners, and enlist online platforms like Airbnb to help enforce the City's enactments.  The ordinances violate multiple constitutional and statutory protections, and they injure the City and its residents, who will be deprived of income, tax revenue, economic activity, and cultural enrichment.

The City contends that it drafted the ordinances based on Fifth Circuit dicta in a prior challenge to an earlier STR ordinance.  Mot. at 2.  The Fifth Circuit in that case considered possible

regulatory alternatives to the earlier ordinance that would be less discriminatory against out-of-state homeowners. *See Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 328 (5th Cir. 2022). But the Fifth Circuit did not find that such alternatives would be constitutional or legal if enacted—and understandably so, since that court lacked the information and developed argument necessary to inform any such hypothetical pronouncement. A judge of the Fifth Circuit made this point to the City in a recent oral argument. *See* Recording of Oral Argument at 34:02-35:05, *Hignell-Stark v. City of New Orleans*, No. 24-30160 (5th Cir. Feb. 5, 2025).

The City also minimizes STRs as "a privilege, not a right," offering the flawed defense that they are "commercial activity" subject to "permitting." Mot. at 3. But the overwhelming majority of courts have correctly held that STRs are *residential* in nature. *See Haw. Legal Short-Term Rental All. v. City & Cnty. of Honolulu*, 2022 WL 7471692, at \*7 & n.16 (D. Haw. Oct. 13, 2022) (collecting cases). And the historical record laid out in Plaintiffs' Amended Complaint underscores that there is a long-standing tradition of property owners opening up their homes to guests on a short-term basis by exercising their fundamental property rights to lease and to include.

These rights, which have an equally robust historical pedigree in Louisiana property law, *see State v. City Sav. Bank & Tr. Co.*, 127 So. 890, 891 (La. 1930), do not lose protection just because New Orleans has labeled STRs as "commercial" or because online platforms like Airbnb have made it easier for homeowners to open their homes to guests on a short-term basis. *Contra* Mot. at 3. After all, New Orleans "may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 645 (2023); *accord Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) (government may not "by *ipse dixit* . . . transform private property into public property without just compensation"). New Orleans homeowners are doing what

homeowners have done since time immemorial—exercising their fundamental property rights to welcome guests on their property for as long as the homeowner wishes. *See* 2 W. Blackstone, Commentaries on the Laws of England 199 (1766) (defining the temporal nature of the leasehold). The City's effort to redefine STRs as "a privilege, not a right" is a blatant attempt to "'disavow[] traditional property interests'. . . [that] it wishes to appropriate." *Tyler*, 598 U.S. at 638. The Supreme Court has repeatedly rejected such unconstitutional efforts. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 155 (2021). This Court should do the same here.

The Amended Complaint more than adequately pleads the ways in which the City's STR regulations violate the law. Among other problems, the New Orleans City Code, as amended by the ordinances, effect a taking of the host plaintiffs' ("Hosts") and Airbnb's property without just compensation; they deprive Hosts of due process; and they impermissibly interfere with their private relationships. Beyond the direct attacks on individual homeowners' rights, the City is also seeking to unlawfully conscript platforms like Airbnb into its efforts. The ordinances command Airbnb to turn over troves of private and competitively sensitive information to the City without appropriate legal process, and to police the listings posted to its platform in service of an unlawful verification system. In so doing, the ordinances invade Plaintiffs' privacy; they violate Airbnb's First Amendment rights; and they are preempted by the Stored Communications Act and the Communications Act. The Amended Complaint amply supports the eleven claims brought by Hosts and by Airbnb, and the City's motion to dismiss must be denied.

## BACKGROUND

### I.    The Rights to Lease and to Include Others on Property Are Deeply Rooted

As alleged in the Amended Complaint, the practice of leasing one's property to others stretches back to before the founding. First Am. Compl. ("FAC") ¶ 23. By the early Republic, the practice of leasing one's home was routine. *Id.* ¶ 25. Louisiana shares in this tradition. *Id.* ¶ 33.

In Louisiana as elsewhere, homeowners have long leased their homes to others, including for short terms. *Id.* This practice is documented in primary sources and judicial decisions, underscoring that STRs have long been part of homeownership. *Id.* ¶¶ 23-42. The City cannot meaningfully contest this robust historical record. *See* Mot. at 11-12.

## II.    The City Adopts Onerous Restrictions on Short-Term Rentals

In 2017, the City created an STR permitting scheme. FAC ¶ 50. Prior to that time, while there was a provision of the City Code that nominally purported to prohibit homeowners from offering to rent homes for compensation for less than 30 days, *see* City Code Sec. 54-491.1(b), the provision was hardly enforced. The City admits this fact in its own report cited in its motion to dismiss. *See* City of New Orleans City Planning Commission, *Short Term Rental Study - 2018 Ed.* at 17 (Rev. Oct. 5, 2018) https://tinyurl.com/dss86afu; Mot. at 4.

The City went further in August 2019, amending the City Code to limit the availability of STR permits to property owners' primary residences. FAC ¶ 51. Homeowners challenged these amendments and the Fifth Circuit struck them down, holding that they discriminated against out-of-state property owners in violation of the Dormant Commerce Clause. *See Hignell-Stark*, 46 F.4th at 328.

The City adopted additional restrictions on STRs in 2023 by enacting Ordinance No. 29381 M.C.S. and Ordinance No. 29382 M.C.S. ("2023 Ordinances"). FAC ¶ 54. The 2023 Ordinances impose a range of restrictions that, among other things, (i) preclude all but one lottery winner per square block from renting their properties to short-term travelers; (ii) prevent owners from leasing more than one property on a short-term basis; (iii) limit the ability to lease on a short-term basis to natural persons; (iv) force those few who are allowed to rent their homes to do so only if an "operator" resides on the premises; (v) delegate to City employees virtually unfettered discretion to inspect properties without a search warrant, and suspend or revoke STR licenses; and (vi) subject

STR owners to elaborate requirements under threat of severe penalties and private rights of action. *See* City Code Sec. 26-613 *et seq.*

### III.    The 2023 Ordinances Will Not Further the City's Goals

As alleged in the Amended Complaint, the 2023 Ordinances will not serve the City's purported goals. They will not increase the availability of affordable housing, level the playing field among lodging providers, or protect the livability of residential neighborhoods. FAC ¶¶ 73-78. To the contrary, they will thwart the benefits of STRs, which contribute to communities, including by making homeownership affordable, *id.* ¶ 44, and enriching neighborhoods, *id.* ¶ 45. STRs have created thousands of jobs, generated millions of dollars in income for hosts, and hundreds of millions of dollars in economic activity in New Orleans. *Id.* ¶ 5.

### IV.    The 2023 Ordinances Harm Hosts

The 2023 Ordinances have devastating consequences for homeowners. As alleged in the Amended Complaint, plaintiff Darian Morgan owns a home in the Mid-City neighborhood of New Orleans, near his work at University Medical Center New Orleans. *Id.* ¶ 85. The home has two bedrooms, two bathrooms, and one kitchen. *Id.* Before the 2023 Ordinances, he rented out one of the rooms in his house on a short-term basis. *Id.* ¶ 86. Under the 2023 Ordinances, he is no longer allowed to do so because a literal lottery granted the one STR permit allocated to his block to another homeowner. *Id.* ¶ 88.

Plaintiffs Bret Bodin and Brad Newell own a home in New Orleans that includes an upstairs loft and a carriage house. *Id.* ¶ 79. For years prior to the 2023 Ordinances, they rented their loft and/or carriage house out on a short-term basis, helping them afford the cost of living in the city. *Id.* ¶ 81. Because of the 2023 Ordinances, they can no longer rent their carriage house on a short-term basis. *Id.* ¶ 82.

Plaintiff Michael Rosas is a lifelong Louisiana resident and manages a coal-storage facility for an energy company. *Id.* ¶ 90. In 2019, he purchased a triplex to live in one unit and rent the other two on a short-term basis, which would help him afford living costs and pay his mortgage. *Id.* ¶¶ 91-92. He invested substantial capital improving the two rental units to make them attractive to guests. *Id.* at ¶ 91. Because of the 2023 Ordinances, however, he is only able to rent one of them on a short-term basis, causing him to lose significant income. *Id.* ¶ 93. Mr. Rosas also owns plaintiff Mid-City Mike, LLC ("Mid-City Mike"), which purchased a duplex with the hope that it could be rented on a short-term basis. *Id.* ¶ 96. The 2023 Ordinances prevent Mr. Rosas through Mid-City Mike from offering his property for rent on a short-term basis. *Id.* ¶ 97.

## V. The 2024 Ordinance Illegally Conscripts Booking Platforms in Regulating Short-Term Rentals

In 2024, the City enacted Ordinance No. 30074 M.C.S. ("2024 Ordinance") to continue targeting individual property rights, this time by conscripting platforms like Airbnb. While this ordinance takes the form of regulating STR platforms, its effect is to add to the unconstitutional burdens placed on property owners in New Orleans.

*First*, the 2024 Ordinance requires platforms to submit a monthly report to the City containing a trove of sensitive data, much of which both Hosts and Airbnb consider confidential, for example: the number of bookings for each STR during the reporting period, a list of dates during which each STR was booked during the reporting period, and the amount of rent paid for each STR booking. City Code Sec. 26-622(a)(6). The 2024 Ordinance does not require the City to issue any kind of legal process to obtain this data. *Id.* Nor does it provide platforms with any judicial recourse to challenge this compulsory disclosure.

*Second*, the 2024 Ordinance allows the City to obtain additional categories of sensitive data upon the issuance of a subpoena, including sensitive personally identifiable information regarding

hosts, for example: the pinpoint street address of any STR listed on the platform, the name of the person or entity listing any STR, and the dates and duration of STR stays booked through the platform. *See id.* Sec. 26-622(a)(7).

*Third*, the 2024 Ordinance requires platforms to affirmatively and repeatedly "verify the legal eligibility of each booking transaction they facilitate" through an electronic verification system. *Id.* Sec. 26-622(a)(4). Booking platforms must "verify" each listing by transmitting to the City confidential and personal information pertaining to hosts and their operators in order to receive a confirmation code.[1] *Id.* Sec. 26-624(k). Platforms are required to undertake this verification (1) "before any booking transaction is facilitated"; (2) "at least every 30 days of the prior verification in order to facilitate subsequent booking transactions"; and (3) "whenever [the platform] knows or should know that any data it used to complete the most recent verification has changed, including but not limited to the host's name and address of the listing." *Id.* Sec. 26-622(a)(4). The practical effect is to compel platforms to remove public STR listings that do not meet the City's approval—improperly deputizing Airbnb as an arm of the City's law enforcement.

The City Code imposes additional regulations on platforms, including requiring platforms to name the City as an additional insured party under a commercial general liability policy purchased by the platform. *Id.* Sec. 26-622(a)(2).

The 2024 Ordinance's original effective date was March 1, 2025, but the City has repeatedly delayed this deadline; the effective date is currently July 1, 2025.

---

[1] The 2024 Ordinance originally required platforms to verify listings prior to publication, *see* Ordinance No. 30074 M.C.S. Sec. 26-622(a)(4)(i), but the City eliminated that requirement purportedly to address the issues raised in this lawsuit, *see* R. Doc. 20 at 25. In doing so, the City admitted the Ordinance's legal infirmities. But the change to the verification requirement ultimately amounts to window dressing, as it does not meaningfully address the substantive burdens on Airbnb or Hosts.

**ARGUMENT**

"Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). The "court accepts all well-pled facts as true, drawing all reasonable inferences in favor of the nonmoving party." *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (quotations omitted). A motion to dismiss "is not meant to resolve disputed facts or test the merits of a lawsuit." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 581 (5th Cir. 2020).

## I.    The Amended Complaint Adequately Alleges that the 2023 Ordinances Are Unconstitutional

The Amended Complaint adequately alleges that the 2023 Ordinances effect a taking of Hosts' property without just compensation (Counts 1, 2, and 3), deprive Hosts of due process (Counts 4 and 5), and interfere with Hosts' private, civil relationships (Count 6). Each cause of action challenging the 2023 Ordinances states a claim.

### A.    The Amended Complaint States a Takings Claim

The City argues that Hosts fail to state a takings claim, asserting that (1) there is no fundamental property right to rent residential property on a short-term basis, and (2) Hosts do not have a property interest in an STR permit. Mot. at 9-14. Both of these arguments fail.

#### 1.    The Amended Complaint Adequately Alleges that the 2023 Ordinances Appropriate a Fundamental Element of the Property Right and Thus Constitute a *Per Se* Taking (Count 1)

In arguing that renting residential property on a short-term basis is not a fundamental property right, Mot. at 9-12, the City makes three analytical errors: (1) it mistakes the Takings Clause for the Due Process Clause; (2) it incorrectly defines the right at issue as *exclusively* the

right to rent residential properties short-term; and (3) it focuses too narrowly on an exaggerated account of the differences between the historical practice of short-term leasing and STRs today.

To begin, the City disputes whether the right to rent residential property on a short-term basis is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." Mot. at 10 (quoting *Dobbs v. Jackson's Women's Health Org.*, 597 U.S. 215, 231 (2022)). But that focus reflects a category error. The City cites Due Process Clause case law, an entirely different doctrinal area that does not govern the takings claims at issue.[2] Indeed, the City's approach to the historical record cannot be squared with a proper application of takings jurisprudence. Under the Takings Clause, when the government takes private property for public use, it must "pay for what it takes." *Sheetz v. County of El Dorado*, 601 U.S. 267, 273 (2024). This obligation is automatically triggered when the government effects a *per se* taking, which occurs any time the government appropriates or otherwise interferes with "a fundamental element of the property right." *Cedar Point*, 594 U.S. at 151; *see Sheetz*, 601 U.S. at 274. Whether something is a "fundamental *element* of the *property right*" is defined by reference to long-standing rules and understandings about property rights—covering the gamut from "traditional property law principles" to "historical practice and [Supreme Court] precedents." *Tyler*, 598 U.S. at 638.

Consider, for example, *Cedar Point*. There, the Supreme Court held that any appropriation of the "right to exclude" others from one's property constitutes a *per se* taking because the "right to exclude" is "a fundamental element of the property right that cannot be balanced away." 594 U.S. at 158. The Court described the right to exclude as a fundamental element of the property right because "the very idea of property entails 'that sole and despotic dominion which one man

---

[2] For that reason, the district court's brief discussion in *Hignell v. City of New Orleans*, 2024 WL 838217, at *22 (E.D. La. Feb. 24, 2024), regarding whether the right to lease is a fundamental due process right is not relevant, let alone dispositive, to Hosts' takings claims. Mot. at 9.

claims and exercises over the external things in the world, in total exclusion of the right of any other individual in the universe.'" *Id.* at 149-50 (quoting Blackstone, *supra*, at 2). The appropriation of a fundamental element of property ownership long and historically recognized as such—there, the right to exclude—constituted a *per se* taking. *Id.*  In other words, the Takings Clause afforded the property owner protection because the right at issue was a "fundamental element of the property right," as informed by historical practice and Supreme Court precedent. *Id.* at 149.  The rights at issue here—the rights to lease and to include others on one's property, *see, e.g.*, FAC ¶¶ 126-27—readily qualify as "fundamental element[s] of the property right."

Start with the right to lease: the Louisiana Supreme Court recognized nearly a century ago that "the right to lease one's property may be regarded as an incident of ownership" and is constitutionally protected. *See City Sav. Bank*, 127 So. at 891.  And as the Fifth Circuit has explained, under Louisiana law, "full ownership of property" consists of "bundles of rights," among them, "the right to abuse or alienate, i.e., transfer, *lease*, and encumber the property." *Rodrigue v. Rodrigue*, 218 F.3d 432, 436-37 (5th Cir. 2000) (emphasis added).  The U.S. Supreme Court has likewise described the "right[] to . . . lease" as an "essential attribute[] of property." *Terrace v. Thompson*, 263 U.S. 197, 215 (1923).  This consistent refrain underscores the traditional understanding that ownership of property entitles the owner to lease out the property to another.  And by definition, that means the owner holds the power to define the lease's term, as the defining characteristic of a lease is its temporal duration.  *See* La. C.C. Art. 2678 (a lease "shall be for a term" which may be "fixed or indeterminate," defined "as agreed to by the parties."); *accord* Blackstone, *supra*, at 199.

The City fails to grapple with these core principles, claiming that there is no fundamental property right to "rent[] property short term in a residential area."  Mot. at 9.  That misunderstands

Hosts' claims.  As Hosts alleged, property ownership has traditionally been understood to include the right to lease, *see, e.g.*, FAC ¶ 4, a proposition the City does not dispute.  And that means an owner's exercise of that right is afforded constitutional protection under the Takings Clause.  The right to lease authorizes the owner to define the lease's term, *see, e.g.*, La. C.C. Art. 2678, another proposition the City cannot and does not dispute.  After all, the lease's temporal nature is the *sine qua non* of what makes a lease a lease.  If a property owner (in a residential neighborhood or otherwise) wishes to lease out their property, they are entitled by virtue of their property ownership to offer a lease of whatever duration the owner sees fit—all while receiving complete protection under the Takings Clause.

The Constitution does not allow the City to artificially reframe the property right at issue to only leases of a certain term, and then insist that this narrowed conception of the right is not a fundamental stick in the property bundle.  In *Cedar Point*, the Supreme Court rejected exactly such an attempt to recharacterize the right at issue.  There, the regulation required agricultural employers to allow union organizers onto their property for three hours per day, 120 days per year.  594 U.S. at 143.  The dissent, like the City here, highlighted the narrowness of the restriction, which authorized union organizers to access agricultural employers' properties only for certain purposes, in certain areas, and at certain times.  *Id.* at 166 (Breyer, J., dissenting).  But the majority looked to the core property right implicated by the labor regulation—the owners' right to exclude—which was implicated even though the state had appropriated it only temporarily and for limited purposes.  *Id.* at 149, 153.

The Court should do the same here.  The 2023 Ordinances appropriate the right to lease, even if the City has targeted its appropriation at leases of certain terms.  To hold otherwise would be to allow the City to step into the property owner's shoes and dictate how they may exercise

their right to lease.  The Takings Clause guards against such attempts to commandeer owners' exercise of their own fundamental property rights to serve some public purpose, without paying the injured property owner just compensation.  *See id.* at 149-50; *see also, e.g.*, *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1294 (Fed. Cir. 2008).   Because Hosts have adequately alleged that the City has appropriated their right to lease by impermissibly interfering with their ability to create leases with short terms, *see, e.g.*, FAC ¶ 126, they have stated a claim that the ordinances violate the Takings Clause.

Beyond the right to lease, the City also entirely ignores Hosts' other arguments as to why the challenged ordinances violate the Takings Clause: that they appropriate their right to include others on one's property, *see, e.g.*, FAC ¶¶ 127-29, a necessary corollary of the right to *exclude* that *Cedar Point* reaffirmed was a core property right, *see* 594 U.S. at 149-50.  Both the right to exclude and the right to include are necessary for property owners to act as gatekeepers of their property and to realize its full value.  *See, e.g.*, Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 740 n.37, 742-43 (1998).   To say that property owners have a right to "exclude" others from their property is simply another way of saying that property owners may decide which individuals to "include."  *See Union Carbide Corp. v. Alexander*, 679 S.W.2d 938, 940 (Tenn. 1984) (noting that property ownership confers the right to take certain actions with one's property, as well as the correlative "*right to refuse to do any of*" those things (emphasis added)).  Leasing one's property to another on one's own terms is one of the principal ways that property owners may exercise—indeed, have always exercised—their right to include.  When the Government purports to dictate which guests an owner can invite on their property (by forbidding those who would be interested in a short-term stay), it necessarily appropriates the right to include. *See Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994) (noting that a government-

mandated easement would cause the owner to "lose all [her] rights to regulate the time in which the public entered onto the greenway"). Just as governmental appropriation of the right to exclude constitutes a *per se* taking, *see Cedar Point*, 594 U.S. at 149, so too does governmental appropriation of the right to include.

Without any serious defense on the merits of the takings analysis laid out in the Amended Complaint, the City suggests that modern STRs are different from the historically-rooted practices of leasing and inclusion. Mot. at 11-12. These attempts fall flat. The City's primary argument about whether the historical practice of short-term leasing and STRs today are exactly the same— *i.e.*, the extent to which homeowners today choose to rent their homes for the same durations as homeowners did in 1800 or 1900—is the same myopic argument the Supreme Court has repeatedly rejected when it has applied old law to new facts. *See District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citations omitted)). Similarly, that hosts now use digital tools available today to facilitate their exercise of their historically-rooted property rights (*see* Mot. at 3) neither diminishes the fundamental nature of those property rights, nor extricates those property rights from their historical pedigree.

The City's attempts to distinguish the historical record also fail on their own terms. The examples in the Amended Complaint documenting "monthly" rentals are not "irrelevant." Mot. at 11. The defining characteristic of a lease is the fact that it has a term agreed between the owner and the renter. *See* La. C.C. Art. 2678. The historical record of Louisianans exercising their right to lease by creating leases with *different* terms—some monthly, some weekly—underscores that

13

the owner's ability to set the duration of the stay is the very essence of what it means to exercise the right to lease. And the point of the 19th century precedent cited in the Amended Complaint is not to show that there were disputes over the duration of a lease or a landlord's ability to rent property on a short-term basis. Mot. at 11. The point is to emphasize that the practice of leasing— for any term, including short terms—was ubiquitous. While zoning law is "of modern origin," *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926), the right to lease goes back much further, FAC ¶ 23. The City's argument that it *began* regulating "transient lodging" only in 1929, Mot. at 11-12, only accentuates the validity of Plaintiffs' account of the historical roots of STRs.

That leaves the City's misplaced attempt to analogize to its own prior regulation of "lodging houses" and "commercial activity." Mot. at 9, 11-12. Those regulations are of far more recent vintage and do not qualify as long-standing restrictions on the exercise of property rights that play into the takings analysis. *Cf. Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029-32 (1992). And as Hosts' circumstances make clear, STRs are not "*de facto* hotel[s]." Mot. at 9. STRs are *residences* being used for *residential purposes*. Hosts offer *homes* for rent on a short-term basis to travelers who use them to eat, rest, and sleep—activities that can only be described as residential. That is why "the appellate courts of at least nineteen states have decided that even rental stays of *less than* 30 days—nightly, weekend, or weeklong stays—constitute residential uses or purposes." *Haw. Legal Short-Term Rental All.*, 2022 WL 7471692, at *7 & n.16.

The City's suggestion that it can take away these rights without paying just compensation because the City purportedly began regulating "lodging houses" in 1929 and otherwise has the power to limit the location of "businesses such as grocery stores" and "street vendors" is as wrong as it sounds. Mot. at 12. The 1929 code that the City cites describes "lodging houses" as essentially small hotels and distinguishes them from, among other types of buildings, single- and

multi-family dwellings. *See* New Orleans City Planning and Zoning Comm'n, *Hand Book on Comprehensive Zoning Law for New Orleans, La.* at 10 (1944), https://tinyurl.com/4nvn6kkw; Mot. at 12. Whereas "hotels" were buildings "in which there [were] more than fifteen (15) sleeping rooms usually occupied singly," "lodging houses" were buildings "other than a hotel, containing not more than fifteen (15) sleeping rooms, where lodging for five or more persons [was] provided for compensation." *See Hand Book on Comprehensive Zoning Law*, *supra*, at 10. Neither is analogous to Hosts renting out homes on a short-term basis here. Mr. Morgan, for example, lives in a two-bedroom, two-bathroom home and, before the 2023 Ordinances took effect, rented out a single spare bedroom in his home on a short-term basis. FAC ¶¶ 85-89. Hosts are *homeowners* renting *homes*—they are not 1929-style "lodging houses," let alone "businesses such as grocery stores" and "street vendors." Mot. at 12.[3]

The City separately argues that Hosts have not established a property interest, or entitlement to, an STR permit. Mot. at 12-14. The City again commits a category error. Hosts do not argue that they are entitled to *STR permits*. They argue instead that *the City's restrictive STR regulatory scheme itself* effects an unconstitutional taking by appropriating their rights to lease and to include others on their property without just compensation. *See, e.g.*, FAC ¶¶ 126-29. The City cannot circumvent the Takings Clause by creating a permitting scheme that prohibits homeowners from exercising their fundamental rights to lease and to include others on their properties. "'[B]asic and familiar uses of property' are not a special benefit that 'the Government may hold hostage, to be ransomed by the waiver of constitutional protection." *Cedar Point*, 594 U.S. at 162 (quoting *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015)). Hosts' rights to lease

---

[3] The City's citation to *City of New Orleans v. Dukes*, 427 U.S. 297 (1976) is inapposite. That case concerned an ordinance "challenged solely as violating the Equal Protection Clause," *id.* at 303, a claim not asserted here.

and to include others on a short-term basis are central to property ownership itself, precede any authorization from the City, and are independently protected by state law. *See City Sav. Bank*, 127 So. at 891. The Takings Clause thus protects Hosts from the City's appropriation of those rights via the unlawful permitting scheme it has enacted. Hosts have stated a viable *per se* takings claim.

2. **The Amended Complaint Adequately Alleges that the 2023 Ordinances Constitute a Regulatory Taking (Count 2) and a Taking Under the Louisiana Constitution (Count 3)**

The City devotes two short paragraphs to arguing that Hosts fail to state a regulatory takings claim under the U.S. Constitution and an inverse condemnation claim under the Louisiana Constitution. Mot. at 14. The City's argument rests on the mistaken premise that Hosts are claiming a right to "an STR permit," which the City describes as a "privilege." *Id.* at 12-14. But that is not what Hosts claim. Hosts assert that the 2023 Ordinances appropriate their rights to lease and to include others on their property, *see, e.g.*, FAC ¶¶ 135, 144, rights that are independently protected by state law, *see, e.g.*, *City Sav. Bank*, 127 So. at 891.

A regulatory taking occurs when government regulation of property goes "too far." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). In making this determination, courts balance: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Aside from quibbling with Hosts' entitlement to an STR *permit*, the City does not dispute that Hosts have plausibly alleged that the *Penn Central* factors weigh in their favor. Nor could it. Hosts purchased their properties and made substantial investments to improve them for short-term guests. *See* FAC ¶¶ 80, 86, 91, 96. Hosts' property values and income have been substantially diminished by the 2023 Ordinances. *See id.* ¶¶ 83, 89, 93, 98. And the character of the government action—a direct appropriation of Hosts' property rights by means of a literal lottery, *see* City Code

Sec. 26-617(g)—is extraordinary. *See* Thomas Merrill, *The Character of the Governmental Action*, 36 Vt. L. Rev. 649, 664 (2012) ("[R]egulations that impose burdens exclusively on some owners while generating benefits for others have a skewed distributional impact" and are appropriately viewed as takings.). All three factors support finding that Plaintiffs have adequately stated a regulatory takings claim under *Penn Central*.[4]

Hosts likewise state a viable inverse condemnation claim. FAC ¶¶ 139-44. The City's only argument against Hosts' inverse condemnation claim is that "no property right is affected here." Mot. at 14. But as explained, the 2023 Ordinances affect Hosts' rights to lease and to include others—rights long protected by Louisiana courts. *See, e.g.*, *City Sav. Bank*, 127 So. at 891. The City does not dispute that Hosts have adequately pled the other necessary elements of an inverse condemnation claim.

**B.    The Amended Complaint States Due Process and Void-For-Vagueness Claims**

The City's arguments opposing Hosts' due process claims are equally unavailing. The Amended Complaint adequately alleges that the 2023 Ordinances violate Hosts' due process rights by depriving them of their fundamental right to lease their property and subjecting them to impermissibly vague operating requirements.

**1.    The Amended Complaint Adequately Alleges that the 2023 Ordinances Violate Hosts' Due Process Rights (Count 4)**

Due process protects "fundamental rights and liberties" that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and quotations omitted). The right to lease

---

[4] If *Penn Central* somehow authorizes what the City has done here, then the Supreme Court should revisit that test, which is not "ground[ed] . . . in the Constitution as it was originally understood." *Murr*, 582 U.S. at 419 (Thomas, J., dissenting).

one's property, for any time period, to guests as a temporary place of abode is one such right: it dates back to before the founding and has been exercised by Louisianans and Americans alike for centuries. *See* FAC ¶¶ 23-42; *see also* 1 W. Blackstone, Commentaries on the Laws of England 134 (1765) ("[P]roperty . . . consists in the free use, enjoyment, and disposal of all his acquisitions"). A property owner's right to use their property how and with whom they choose is consistent with a long constitutional tradition recognizing the home as a sanctuary, a place where privacy, autonomy, and free association are entitled to the utmost protection. *See Payton v. New York*, 445 U.S. 573, 601 (1980); *see also Lawrence v. Texas*, 539 U.S. 558, 567 (2003); *Minnesota v. Olson*, 495 U.S. 91, 95-100 (1990); *Stanley v. Georgia*, 394 U.S. 557, 565 (1965); *accord* Margaret Jane Radin, *Property and Personhood*, 34 Stan. L. Rev. 957, 992 (1982) (describing the home as "a moral nexus between liberty, privacy, and freedom of association"). Neither the City nor the district court's non-binding discussion of the right to lease in *Hignell*, 2024 WL 838217, at *22, grapples with these interwoven constitutional protections—let alone addresses the robust historical record alleged in the Amended Complaint of homeowners' exercise of their right to lease. *See* FAC ¶¶ 23-42. The City attempts to avoid this conclusion by advancing its own facts, *see* Mot. at 16, but those facts are inappropriate on a motion to dismiss. The Court must accept Hosts' well-pleaded facts in the Amended Complaint as true. *Armstrong*, 60 F.4th at 269.

If a regulation implicates a fundamental right protected by the Due Process Clause, it is unconstitutional unless it can satisfy strict scrutiny, meaning that the regulation is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). This is "the most demanding test in constitutional law." *Dep't of State v. Munoz*, 602 U.S. 899, 911 (2024). To pass strict scrutiny, there must be no less-restrictive alternative means of achieving the government's goals. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000). The

City does not attempt to defend the Ordinances under strict scrutiny.  Nor could it.  The Amended Complaint adequately alleges that the 2023 Ordinances are far from "narrowly tailored" to serve a compelling government interest.  *See Reno*, 507 U.S. at 302.

The 2023 Ordinances state three main objectives: (1) improving housing affordability, (2) leveling the playing field among lodging providers, and (3) reducing disruption of neighborhoods and enhancing quality of life.  *See* Sec. 26-613(b).  It is far from clear that the Ordinances serve these objectives at all.  As alleged in the Amended Complaint, the driver of housing unaffordability is the underproduction of housing, not STRs.  FAC ¶ 73.  The recent experience of other cities shows that severe STR restrictions create no meaningful increase in the supply of long-term rental units or decrease in rents.  *Id.* ¶ 74.  In fact, a ban on STRs in one city led to an *increase* in rental prices.  *Id.*  Nor will the ordinances create a more level playing field in the rental market.  The very inclusion of this interest *codified in the City Code* underscores the political power of the hotel lobby, which, without STRs, will have the "ability to price at maybe what the customer would describe as sort of gouging rates" around large events.  *Id.* ¶ 76.  As alleged in the Amended Complaint, the 2023 Ordinances will necessarily tilt lodging options away from residential homeowners and towards hotels and bed-and-breakfasts.  *Id.*  Finally, the 2023 Ordinances bear no connection to reducing disruption of neighborhoods and enhancing quality of life.  Studies have found no evidence that STRs lead to increased noise, traffic, or unruly behavior.  *Id.* ¶ 77.

There are ample alternatives available to the City that would burden Hosts' rights less severely.  For instance, "if the City is serious about protecting affordable housing," one "obvious" alternative is to "increas[e] supply" by encouraging the construction of new housing.  *See Hignell-Stark*, 46 F.4th at 328.  The City could do so by "eliminat[ing] price controls, reduc[ing] housing regulations, and provid]ing] additional incentives for homebuilders to construct more

housing." *Id.* And if the City is concerned about reducing disruption of neighborhoods and enhancing quality of life,[5] *see* Sec. 26-613(b), it can do so by enforcing existing *neutral* rules, such as clearly defined noise ordinances, which serve the same purposes without disproportionately singling out property owners who choose to exercise their right to lease. Not only is this a less-restrictive alternative; it is *more* logically related to the City's stated goals, given that all types of property users—owners, long-term tenants, short-term tenants, and other guests—are capable of disruptive uses of property. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011) (to pass strict scrutiny, a law must be "neither seriously underinclusive nor seriously overinclusive").

Even under a rational basis approach, the City would still need to show that the 2023 Ordinances are "rationally related to a legitimate government interest." *See Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 561 (5th Cir. 2017). After all, a government regulation violates due process, regardless whether a *fundamental* right is implicated, when "the government arbitrarily abuses its power to deprive individuals" of their rights. *See Simi Inv. Co., Inc. v. Harris County*, 236 F.3d 240, 249 (5th Cir. 2000). Rational basis review is not "toothless," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976); it demands that restrictions have a "reasonable connection" to the purposes they purport to advance, *see Hines v. Quillivan*, 982 F.3d 256, 275 (5th Cir. 2020). In this case, the factual allegations throughout the Amended Complaint establish that there is no relationship between the content of the ordinances and their stated purposes. *See, e.g.*, FAC ¶¶ 71-78. Based on these factual allegations, Hosts have met their burden even under the more lenient rational basis standard. *See, e.g.*, *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 225 (5th

---

[5] The City's emphasis on the supposed quality-of-life problems "created by widespread *whole home* rentals," Mot. at 5 (emphasis in original), only calls into question the sincerity of the City's interests. The 2023 Ordinances do far more than regulate whole-home rentals. Indeed, the Hosts in this case are being deprived of the ability to rent *parts* of their homes. FAC ¶¶ 82, 85-89, 93.

Cir. 2019) ("Rational basis review is fact intensive."); *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 951 (D. Md. 2019) ("[R]ational basis analysis is usually a fact-intensive inquiry made after a full consideration of the factual record.").

### 2. The Amended Complaint Adequately Alleges that the 2023 Ordinances Are Unconstitutionally Vague (Count 5)

The Amended Complaint adequately alleges that several aspects of the 2023 Ordinances are unconstitutionally vague, including (1) the requirements that hosts must ensure that all rooms are "adequately lighted" and that an operator be able to "resolve complaints" within an hour; (2) the provisions that penalize "any noise . . . that is louder than a conversational level," "offensive odors," and "litter"; and (3) the unlimited discretion granted to hearing officers to determine whether to suspend or revoke a license. *See* FAC ¶¶ 158-60.

The City contends that Hosts "have made what amounts to a threadbare facial challenge," implying that Hosts are "speculating about hypothetical conduct." Mot. at 18-19. But Hosts' allegations are far from hypothetical. Mr. Bodin and Mr. Newell, for example, currently rent out the loft in their home on a short-term basis with a permit from the City, *see* FAC ¶ 82, and therefore must comply with the 2023 Ordinances' operating requirements. Mr. Rosas, too, is currently renting one of his units on a short-term basis. *Id.* ¶ 93. And because the 2023 Ordinances regulate nearly every aspect of what can occur at a rental—from noises to smells to lighting to the length of bedsheets—it is necessarily the case that the Ordinances' requirements are implicated with each rental. It is all but guaranteed that at some point during each rental, a light will be turned on, food will be cooked, or someone will make a sound.

It is no answer that Hosts "may make inquiries" to the City to clarify whether certain conduct is prescribed or "may engage in the administrative process to dispute any purported violation." Mot. at 19. *First*, the City must defend the Ordinances as they are written. *See Hall*

*v. Bd. of Sch. Com'rs of Mobile Cnty., Ala.*, 681 F.2d 965, 969 (5th Cir. 1982) (policies held invalid because "as written they do not furnish sufficient guidance to prohibit the unbridled discretion that is proscribed by the Constitution").  And as they are written, they provide no indication of what specific conduct is actually permitted or proscribed.  *Second*, although civil statutes are held to a lower standard than criminal statutes, Mot. at 18-19, they still must satisfy a constitutional minimum, which requires that terms not be so vague that they necessarily will result in differing applications.  *See Bode v. Kenner City*, 303 F. Supp. 3d 484, 503 (E.D. La. 2018).  *Third*, Hosts are not "[r]egulated businesses" that can be expected to engage with regulators in the same way that hotels or other enterprises can.  Hosts are renting out *homes* for *residential purposes* for guests to eat, sleep, bathe, and cook.  *See supra* pp. 14-15.  *Fourth*, the administrative process compounds the vagueness problem by granting the City unlimited discretion over revocation and suspension decisions.  *See* City Code Sec. 26-628(c).  Hosts have raised a plausible void-for-vagueness claim.

C.    **The Amended Complaint States a Claim for Improper Interference with Private, Civil Relationships (Count 6)**

Article VI, Section 9(A), of the Louisiana Constitution provides that "[n]o local governmental subdivision shall . . . except as provided by law, enact an ordinance governing private or civil relationships."  The City does not dispute that the relationships between Airbnb and hosts, and hosts and guests, are private, civil relationships under Art. VI, § 9(A).  Rather, the City contends that, because Art. VI, § 9(A) includes the phrase, "except as provided by law," the City's inherent police power overrides plaintiffs' contractual rights.  Mot. at 20.

If that phrase meant what the City says, the reservation of power to the State under Article VI, § 9(A), would be a dead letter.  As the now-Chief Justice of the Louisiana Supreme Court observed in his concurrence in *New Orleans Campaign for a Living Wage v. City of New Orleans*, the delegates to Louisiana's constitutional convention chose the phrase "except as provided by

22

law" as an exception for "*specific cases* as authorized by the legislature." 825 So.2d 1098, 1119 (La. 2002) (emphasis added).

Here, the Louisiana legislature has not provided specific authorization for municipalities to regulate the private, civil relationships between Airbnb and hosts, or between hosts and guests. But that is exactly what the 2023 and 2024 Ordinances do. For instance, the 2023 Ordinances prohibit many homeowners from entering into private hosting relationships with guests altogether. *See* City Code 26-617(g). When homeowners are allowed to enter into such relationships, the 2023 Ordinances regulate them extensively. The 2023 Ordinances require, among other things, that an "operator" "[r]eside on the property" and be "available during all periods of guest occupancy." *Id.* Sec. 26-620 (1)(a)(1)(e). And they set rules on what exactly a host must provide to a guest during the guest's stay. *See, e.g., id.* Sec. 26-618(6)(c). The 2024 Ordinance, moreover, regulates the private, civil relationships between Airbnb and hosts by effectively requiring online platforms like Airbnb to remove certain listings posted by hosts and prohibiting those platforms from processing certain transactions. *See id.* Sec. 26-622.

The City's reliance on *Ralph v. City of New Orleans*, 4 So.3d 146 (La. Ct. App. 2009), is misplaced. Mot. at 20-21. There, the court held that the City's use of a registry to extend health benefits to unmarried "domestic partners" of City employees did not violate Art. VI, § 9(A), because the use of the registry did not "regulate the creation, maintenance or termination of the [domestic] partnerships;" it merely "provide[d] rules pursuant to which the partnerships may be registered." *Id.* at 156. While the court also suggested that a prohibition on STRs in the French Quarter would not violate Art. VI, § 9, that suggestion was dicta. *See Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000) ("A statement should be considered dictum when it could have been deleted without seriously impairing the analytical foundations of the holding [and], being

peripheral, may not have received the full and careful consideration of the court that uttered it." (quotations omitted)).  In any event, the City's STR regulations at issue here not only *require* registration before a homeowner can offer her home for rent on a short-term basis, they also, unlike the STR restriction commented on in *Ralph*, impose obligations on hosts that "govern" and "regulate" hosts' relationships with guests, as noted above.

This case is accordingly much more like *Javers v. Council of City of New Orleans*, where a proposal to "require the registration" of rental units and prescribe "the contents of a lease between a landlord and a tenant" was held to "fly in the face" of state laws "pertaining to freedom of contract, property rights in general and relations between landlord and tenant in particular."  351 So.2d 247, 249 (La. Ct. App. 1977).  The court pointed to, among other provisions, Art. VI, § 9(A), as evidence of the proposal's unconstitutionality.  *Id.*  Here too, the Amended Complaint adequately alleges that the 2023 and 2024 Ordinances improperly interfere with the private, civil relationships between hosts and guests, and Airbnb and hosts.

## II. The Amended Complaint Adequately Alleges that the 2024 Ordinance and Related City Code Provisions Are Unlawful

The 2024 Ordinance enlists Airbnb in the City's unlawful regulation of STRs, including by forcing Airbnb to disclose private information about hosts' STR listings and booking activity, and by requiring Airbnb to verify such listings' licenses against a City database.  In doing so, the 2024 Ordinance violates constitutional and statutory law.  Moreover, the City Code requires that Airbnb must add the City as an insured party on Airbnb's liability insurance, effecting an unconstitutional taking of Airbnb's property interest in its policy.  The Amended Complaint properly states five claims against the 2024 Ordinance and the City Code, and the City's motion to dismiss these claims must be rejected.

**A.      The Amended Complaint States a Fourth Amendment Claim (Count 7)**

The Amended Complaint states a claim for relief under the Fourth Amendment. FAC ¶¶ 170-76. The Fourth Amendment protects records in which a person has a "subjective expectation of privacy" that "society [is] willing to recognize . . . as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (quotation omitted). The 2024 Ordinance's monthly reporting and verification requirements both compel Airbnb to disclose data about its users—including Messrs. Bodin, Newell, and Rosas, who currently list properties on Airbnb—to the City. *See* City Code Sec. 26-622(a)(6), 26-624(k). This data includes highly sensitive and private details about users' income, the activity in their homes, as well as personal identifying information including their names and addresses. *Id.* This is information that users have entrusted to Airbnb, or created in conjunction with Airbnb, for the limited and specific purpose of sharing homes with travelers. This is information that Messrs. Bodin, Newell, and Rosas consider to be sensitive and private, and Airbnb considers to be highly confidential business records. FAC ¶¶ 84, 95, 104, 172-74. As such, the data is entitled to protection under the Fourth Amendment.

The City accepts in its motion that Airbnb has a Fourth Amendment-protected privacy interest in the data sought by the 2024 Ordinance, but claims that Airbnb users consent to the disclosure of their data under Airbnb's Privacy Policy.[6] Mot. at 22-23. This is an extraordinary argument that would demolish consumer privacy. Simply because a user provides their data to a platform like Airbnb does not defeat their reasonable expectation of privacy for purposes of the Fourth Amendment. *See United States v. Warshak*, 631 F.3d 266, 286-87 (6th Cir. 2010) ("the degree of access granted to" a service provider via its terms of service "does not diminish the

---

[6] As a procedural matter, the Privacy Policy is not contained within the pleadings and should not be considered at this juncture.

reasonableness of [the user's] trust in the privacy of his" information); *see also Carpenter v. United States*, 585 U.S. 296, 309-10 (2018) (reasonable expectation of privacy notwithstanding data sharing with wireless carrier).  In this digital age, when individuals regularly entrust their data to service providers such as Airbnb, it is critical that courts recognize that revealing one's data to a trusted *provider* does not amount to a release of one's privacy expectations with respect to the *government*.  *Cf. Carpenter*, 585 U.S. at 315 ("cell phones and the services they provide"—such as apps—"are such a pervasive and insistent part of daily life" that they are "indispensable to participation in modern society" (quotation omitted)).  The City's alternative, that participating in modern life means handing over one's digital footprint to the government wholesale, is untenable.  Moreover, the City points to a provision in Airbnb's Privacy Policy that data may be disclosed  when Airbnb is "required . . . to do so by law" pursuant to Airbnb's "legal obligations," Mot. at 23, Airbnb Privacy Policy Sec. 4.3.2(i), but that acknowledgement is obviously premised on the obligation being *legal—i.e.*, the question presented in this case.  Accordingly, Airbnb and Messrs. Bodin, Newell, and Rosas all have a reasonable expectation of privacy in the subject data.

Because the data at issue in the Ordinance is protected by the Fourth Amendment, any government demand for that data must be reasonable.  As the City concedes, that means the 2024 Ordinance must at a minimum (1) provide platforms with an opportunity for pre-compliance judicial review, *Los Angeles v. Patel*, 576 U.S. 409, 420-21 (2015), and (b) be reasonably limited in scope in the information it seeks, *See v. City of Seattle*, 387 U.S. 541, 544 (1967).  *See* Mot. at 23-24.  The 2024 Ordinance fails both requirements.[7]

---

[7] The City misleadingly asserts that "Airbnb did not appeal a recent decision in a New York district court to uphold an ordinance that contains nearly the same reporting requirements found in the New Orleans' 2024 Ordinance."  Mot. at 4.  But Airbnb did not assert a Fourth Amendment claim in that case (nor a Stored Communications Act or First Amendment claim, which it raises against the monthly report requirement here).  *See Airbnb, Inc. v. New York City Mayor's Office of Special* (continued…)

*First*, the 2024 Ordinance provides no opportunity for pre-compliance review. The City asserts that Section 26-626 of the City Code requires a notice-and-hearing process before any enforcement action may occur under the 2024 Ordinance. Mot. at 23. But that section does *not* state that the City *must* provide notice and a hearing before enforcing any violation of the Code's STR provisions. Rather, Section 26-626 states that "[n]otice and hearing requirements for determining violation(s) shall be in accordance with the administrative procedures provided in Chapter 6, Article II" of the Code. And that provision, in turn, applies only with respect to "the owners of immovable property or their agents, tenants, or representatives, or by any person permitted as a short-term rental owner or operator." City Code Sec. 6-32. Enforcement actions against STR platforms are *not* covered.

Even if this notice-and-hearing provision applied to STR platforms, the Supreme Court has made clear that the Fourth Amendment requires "the subject of the search [to] be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420. That is, it is *the person subject to the search* that must be able to seek judicial review *before* compliance is required. Here, the notice-and-hearing provision allows only "an agency of the [C]ity" to initiate a review to "enforce violations" *after* non-compliance has already occurred; it does not allow a platform subject to the Code to raise its objections before the data is required to be provided. City Code Sec. 6-32. This post hoc procedure does not satisfy the Fourth Amendment, because platforms can "only refuse to comply with [the Code] at [their] own peril,"

---

*Enforcement*, 2023 WL 5044029 (N.Y. S. Ct. 2023). Moreover, the monthly report at issue in that case required Airbnb to disclose only two categories of data, a URL and a confirmation code provided by the city—nothing like the twelve categories of sensitive data at issue here. 43 R.C.N.Y. § 22-03. Meanwhile, the City tellingly fails to address the analogous holding in *Airbnb, Inc. v. City of New York*, in which the court concluded that a monthly data disclosure requirement akin to the 2024 Ordinance likely violated the Fourth Amendment. *See* 373 F. Supp. 3d 467, 495 (S.D.N.Y. 2019) [hereinafter *Airbnb New York*].

given they have no way of initiating review themselves before falling out of compliance.  *Patel*, 576 U.S. at 421; *see also Airbnb New York*, 373 F. Supp. 3d at 493 (concluding that precompliance review for a near-identical monthly disclosure obligation would require "a neutral forum before which a [STR platform] could argue, *before a monthly production deadline*, that the demand for user data was unreasonable under the Fourth Amendment" (emphasis added)).

*Second*, to be considered "reasonable" under the Fourth Amendment, demands for data must be "limited in scope, relevant in purpose, and specific in directive."  *City of Seattle*, 387 U.S. at 544; *see also Airbnb New York*, 373 F. Supp. 3d at 491 (ordinance requiring monthly reporting on all STR listings was "devoid of any [of the] tailoring" required by the Fourth Amendment).  The City's bare assertion that it "thoughtfully tailored the information sought" by the 2024 Ordinance, Mot. at 24, is belied by the fact that it made no effort to narrow its data demands to particular STRs suspected of wrongdoing, or some other more targeted dataset.  *See Airbnb New York*, 373 F. Supp. 3d at 491 ("The universality of the [] monthly production demand . . . , the sheer volume of guest records implicated, and the Ordinance's infinite time horizon all disfavor the Ordinance when evaluated for reasonableness . . . .").  Seeking information on *all* STRs is the opposite of "limited in scope," and if a bare assertion that the information sought is "needed to confirm compliance with [] tax and electronic verification requirements" would suffice, then the Supreme Court's requirement of reasonable tailoring would be meaningless.

The City goes on to say that the subpoena requirement allows the City to obtain additional "more sensitive" categories of information, and that Airbnb could "present the fact-based Fourth Amendment concerns at hand" before complying with a subpoena.  Mot. at 24.  But there would be Fourth Amendment problems with any subpoena seeking such a wholesale disclosure of private data, and in any event, any precompliance review available in connection with the subpoena

requirement does not save the legal infirmities of the monthly report and verification requirements. Indeed, the City's admission that it may obtain "sensitive" name and address information with a subpoena reinforces the wrongfulness of the verification requirement—which demands Airbnb disclose name and address information in connection with *each and every verification request*.[8]

The Amended Complaint states a plausible claim that Plaintiffs' Fourth Amendment rights are violated by the 2024 Ordinance.

**B.    The Amended Complaint States a Claim Under the Stored Communications Act (Count 8)**

The Amended Complaint alleges that the 2024 Ordinance violates and is preempted by the Stored Communications Act ("SCA") because it (1) demands platforms regularly disclose data protected by the SCA without the provision of legal process, and (2) demands platforms comply with subpoenas for SCA-protected data that, under the SCA, may only be obtained with a court order. FAC ¶¶ 177-84.

The City argues that Count 8 "can only be viewed as a facial challenge" and therefore "fails to state a claim" because "[c]ourts have found that where a law includes provisions similar to those in the 2024 Ordinance . . . the law survives a facial challenges under the [SCA]." Mot. at 25. But neither case cited by the City stands for that proposition. In *Homeaway.com v. Santa Monica*, the court concluded that the challenged law required the government to issue a subpoena to obtain

---

[8] The City also fails to grapple with how the monthly report and verification requirements unconstitutionally enlist Airbnb into compulsory service of the City's law enforcement function. FAC ¶ 176. The City claims that the ordinance does not compel Airbnb to "affirmatively verify hosts' registration status and to remove [un-verified] listings," Mot. at 24-25, but the City cannot deny that the Ordinance does explicitly demand that Airbnb verify and re-verify its listings at least every 30 days—a monitoring requirement plainly intended to make Airbnb enforce the City's STR ordinance on its behalf, *see* City Code 26-622(a)(4). And the City cannot evade constitutional scrutiny under the Fourth Amendment by seeking to have Airbnb enforce the City's laws for it.

data that, under the SCA, may be disclosed in response to a subpoena. 2018 WL 3013245, at *7-8 (C.D. Cal. June 14, 2018), *aff'd*, 918 F.3d 676 (9th Cir. 2019). The court did not hold that a facial SCA challenge is *per se* inappropriate, just that the law at issue did not, on its face, violate the SCA. And *San Francisco v. Homeaway.com* did not involve a facial challenge of the SCA at all. 21 Cal.App.5th 1116, 1128-29 (2018). Rather, the court considered whether a specific subpoena violated the SCA; the court did not comment on the merits of a facial SCA challenge. *See id.* Other courts that have analyzed facial SCA challenges of data disclosure laws have granted relief for such claims. *See, e.g.,* Transcript of Preliminary Injunction Hearing at 11, *Homeaway.com, Inc. v. City of Portland*, No. 3:17-cv-00091-MO, ECF No. 36 (D. Or. Mar. 27, 2017). Here, the 2024 Ordinance violates the SCA on its face by mandating the disclosure of data in a manner that contravenes the SCA, and the Amended Complaint accordingly states a claim for relief. FAC ¶¶ 177-84.

The City also asserts the 2024 Ordinance does not violate the SCA because Airbnb has obtained consent to share such data with government entities via its Privacy Policy. *See* Mot. at 26. The weight of the case law establishes that, under the SCA, user consent allows *but does not require* covered providers to disclose user data. *See PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, 273 F. Supp. 3d 558, 561 (W.D. Pa. 2017) (the SCA "specifically states that providers 'may' divulge communications if an exception applies; it does not state that they 'must' do so"); *In re Facebook, Inc.*, 923 F. Supp. 2d 1204, 1206 (N.D. Cal. 2012) ("Under the plain language of Section 2702, while consent may *permit* production by a provider, it may not *require* such a production."); *Schweickert v. Hunts Point Ventures, Inc.*, 2014 WL 6886630, at *13 (W.D. Wash. Dec. 4, 2014) ("Even if the Court could compel Plaintiff to consent to the disclosure of some her emails [], the providers would still only be permitted, but not required, to turn over the contents under [the

SCA].").  In other words, user consent does not transform an otherwise unlawful violation of the SCA into a lawful exercise of government authority.  Here, the 2024 Ordinance purports to compel the disclosure of data protected by the SCA, and Airbnb's Privacy Policy (even if considered) does not rescue the City from that clear conflict.

### C.    The Amended Complaint States a Claim Under Section 230 (Count 9)

The Amended Complaint states a claim under Section 230.  FAC ¶¶ 185-95.  The 2024 Ordinance requires booking platforms to screen and monitor STR listings for information relevant to the City's verification process.  *See* City Code Sec. 26–622(a)(4) (platforms must verify every STR listing "before any booking transaction is facilitated," "at least every 30 days of the prior verification," and every time they "know[] or should know that any data it used to complete the most recent verification has changed").  These requirements impose liability for actions the Fifth Circuit has recognized are protected under Section 230.  *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (Section 230 "specifically proscribes liability" for "decisions relating to the monitoring, screening, and deletion of content" (quotation omitted)).

The City claims that "Section 230 has no such 'monitoring' or 'screening' requirements," and only bars liability when "a publisher *has* monitored or screened content."  Mot. at 26-27.  Yet the provision of Section 230 invoked by the City is *not* the one at issue in this case.  The City is describing Section 230(c)(2), which creates a safe harbor when providers monitor "objectionable" content.  However, the City ignores Section 230(c)(1), which states "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," along with Section 230(e)(3), which states "no liability may be imposed under any State or local law that is inconsistent with this section."

Because "monitoring" and "screening" are "actions quintessentially related to a publisher's role," *Myspace*, 528 F.3d at 420, subsections (c)(1) and (e)(3) together preempt state laws

imposing monitoring and screening requirements on a platform like Airbnb. Courts have agreed that Section 230(c)(1) preempts such regulations, including in the cases the City itself cites. *See, e.g., Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1042-43 (W.D. Tex. 2024) (enjoining law requiring websites to monitor and filter third-party content, stating "Congress barred regulation of websites' decisions relating to the monitoring, screening, and deletion of content" (quotation omitted)); *Airbnb, Inc. v. Boston*, 386 F. Supp. 3d 113, 123-24 (D. Mass. 2019) [hereinafter *Airbnb Boston*] (law requiring Airbnb to "monitor and remove" listings likely violated Section 230); *Homeaway.com v. Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (laws that "require an internet company to monitor third-party content" violate Section 230).

The City also fails to grapple with the second independent way the verification requirement violates Section 230: by forcing Airbnb to remove unverified listings. Under the 2024 Ordinance, platforms are prohibited from completing a booking transaction for unverified listings, and their removal from public view is the only way to ensure customers can differentiate between listings that are available for rent and those that are not. FAC ¶¶ 102, 190. This outcome is a direct and inevitable consequence of the verification requirement's liability scheme. As City Councilmember Jean-Paul Morrell acknowledged, this outcome—takedowns of public listings—is the *goal* of the verification requirement. *See,* Jean-Paul Morrell, Remarks at the New Orleans City Council Meeting at 3:04:40-3:05:08 (Oct. 10, 2024) (the Ordinance will "prevent" STRs "from being listed" and "continually relist[ed]" on STRplatforms), https://tinyurl.com/454rkew7.

Recognizing that Councilmember Morrell's remarks gave away its position, the City adopts a ludicrous interpretation of them. The City claims the term "listing" could mean either "the communicative act of furnishing of information regarding a [STR]" or "the commercial act of offering a [STR] for lease," and that the Councilmember was "clearly" referring to the

latter. Mot. at 27. Yet the City's hair-splitting distinction fails on its face: the purportedly "commercial act" of posting a listing also necessarily reflects and includes "the communicative act of furnishing information." There is no avoiding the conclusion that the Councilmember conceded that the 2024 Ordinance prevents "furnishing of information" on platforms—indeed, that is an explicit purpose of the Ordinance.

The few non-binding cases the City cites to support its argument are unpersuasive and distinguishable. Mot. at 27-29. In *Homeaway.com, Inc. v. Santa Monica*, the Ninth Circuit considered a law that prohibited STR platforms from "completing any booking transaction for properties not licensed and listed on the City's registry," concluding that it did not contravene Section 230 because it did not expressly require platforms to monitor or remove listings. 918 F.3d at 680, 682. Unlike the 2024 Ordinance at issue here, the Santa Monica ordinance did *not* contain a monitoring requirement, and the Ninth Circuit stated that the lack of such a requirement was key to its conclusion that the law did not implicate Section 230.[9] *Id.* at 682 ("[T]he Ordinance does not require the Platforms to monitor third-party content and thus falls outside of the [Section 230] immunity."). And in *Airbnb v. New York City Mayor's Office*, a New York state court dismissed Airbnb's Section 230 claim in four sentences without addressing its arguments or citing any law, rendering it unpersuasive authority. 2023 WL 5044029, at *12. None of these cases detract from the conclusion that Airbnb has stated a plausible Section 230 claim.

---

[9] *Airbnb, Inc. v. San Francisco* and *Airbnb Boston* considered near-identical provisions to *Santa Monica*. 217 F. Supp. 3d 1066, 1072-76 (N.D. Cal. 2016) [hereinafter *Airbnb San Francisco*]; 386 F. Supp. 3d at 119-20. Moreover, *Airbnb Boston* considered an additional provision that "facially compel[led Airbnb] to monitor and remove third-party content," which *was* preempted by Section 230. 386 F. Supp. 3d at 123-24.

### D.     The Amended Complaint States a First Amendment Claim (Count 10)

The Amended Complaint states a claim for relief under the First Amendment's prohibition against compelled speech, FAC ¶¶ 196-204: The monthly report and verification requirements are content-based regulations because they obligate covered entities to speak on particular topics— *i.e.*, the monthly report and verification data—but not others. *See X. Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024). Because they are content-based regulations, these requirements are subject to strict scrutiny, which they cannot withstand. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). No compelling government interest can be served by imposing unduly burdensome requirements on Airbnb to divulge, at least every 30 days, each of twelve categories of information for all New Orleans listings. FAC ¶ 203. And whatever interest the City might have could be satisfied by more targeted means, such as subpoenas seeking information about particular hosts.

The City's primary argument for dismissal is that the cases cited in the Amended Complaint are distinguishable on their facts. Mot. at 29-31. But the City identifies no principled reasons why the rationale of those cases should not apply here. For example, in *DoorDash, Inc. v. City of New York,* the Court concluded that the compelled disclosure of customer information violated the First Amendment. 750 F.Supp.3d 285, 297-306 (S.D.N.Y. 2024). The City observes that in that case, the government mandated disclosure to a private party, as opposed to the government. *Id.* at 290. But compelled speech does not violate the First Amendment any less if it is directed to a private audience, rather than the government, and such a rule would make no sense under basic First Amendment principles. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (any restraint on how an individual may divulge information within their possession implicates the First Amendment); *see also Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,

487 U.S. 781, 782 (1988) (no "constitutional significance" between "compelled speech" and "compelled silence").

The City similarly asserts that *X Corp. v. Bonta* is inapplicable because in that case providers were required to disclose information regarding "the application of [their] content moderation tools to [] users' speech," as opposed to the 2024 Ordinance, which "merely seeks information related to the transactions entered into by Airbnb so that the City can properly collect and audit tax receipts and ensure compliance with the verification provisions of the law." Mot. at 29-30 (citing *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024)). But, here again, the City provides no explanation as to why these disclosure obligations should be treated differently. The Supreme Court has made clear that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell*, 564 U.S. at 568 (quotation omitted). Indeed, in *Sorrell* the Supreme Court affirmed that First Amendment protections applied to transactional information regarding health providers' prescription history—a dataset similar to the information at issue here. *Id.* at 563-64.

The City attempts to distinguish *NetChoice, LLC v. Bonta* on the grounds that the "'primary effect'" of the disclosure requirement in that case was to "'compel speech, distinguishing it from statutes where the compelled speech was plainly incidental to the [law's] regulation of conduct.'" Mot. at 30 (quoting *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024)). The City asserts that by contrast, the 2024 Ordinance requires "reporting of information that seeks only to regulate conduct." *Id.* The City misunderstands the distinction between a law *whose primary purpose is to compel speech*, versus a law whose primary purpose is to regulate conduct *with an incidental impact on speech*. Examples of the latter are "a ban on race-based hiring" that necessarily prohibits the posting of a "White Applicants Only sign," or "an ordinance

against outdoor fires" that would prohibit "burning a flag." *Sorrell*, 564 U.S. at 567 (quotation omitted). Such regulations are completely different from laws that directly "force[] disclosure of information," which necessarily "triggers First Amendment scrutiny." *NetChoice*, 113 F.4th at 1117. This is true even if "other parts of the [law] may primarily or exclusively regulate non-expressive conduct," because "[t]he State cannot insulate a specific provision of law from a facial challenge under the First Amendment by bundling it with other, separate provisions that do not implicate the First Amendment." *Id.* Here, there is nothing incidental about the 2024 Ordinance's data disclosure requirement. The Ordinance by its terms compels speech and triggers First Amendment scrutiny.[10]

Finally, the City asserts that "[c]ourts have repeatedly upheld under the First Amendment the collection of information necessary to verify the legal compliance of a business transaction." Mot. at 31. But in both of the cases cited by the City, the First Amendment claims under consideration did *not* challenge the compelled disclosure of information. Rather, the plaintiffs argued a different theory of liability: that the regulation of booking transactions itself amounted to a First Amendment violation. *See Homeaway.com*, 918 F.3d at 685; *Airbnb San Francisco*, 217 F. Supp. 3d at 1076. Relatedly, the City argues that "collecting a fee for the facilitation of a booking transaction" is not constitutionally protected speech. Mot. at 31. But

---

[10] The City notes that in *X Corp.* and *NetChoice* the Ninth Circuit concluded that the speech at issue was non-commercial, but stops short of arguing that the monthly report and verification data here amounts to commercial speech. Mot. at 30. In all events, these compelled disclosures are not commercial speech because they do not propose commercial transactions; that is, they do not advertise goods or services for sale. *See Dupart v. Roussell*, 497 F. Supp. 3d 102, 117 (E.D. La. 2020) (explaining whether speech is "commercial" turns on "(1) whether the communication is an advertisement; (2) whether it refers to a specific product or service; and (3) whether the speaker has an economic motivation for the speech").

Airbnb's First Amendment claim does not relate to "collecting a fee," but rather the monthly report and verification requirements' compelled disclosure of information.  FAC ¶¶ 196-204.

The Amended Complaint properly alleges a First Amendment claim against the 2024 Ordinance, and the motion to dismiss that claim must be denied.

### E.    The Amended Complaint States a Takings Claim on behalf of Airbnb (Count 11)

The Amended Complaint states a claim for relief under the Takings Clause in connection with the City Code's requirement that Airbnb maintain a commercial insurance policy listing the City as an additional insured.  FAC ¶¶ 205-09; City Code Sec. 26-622(a)(2).  It is indisputable that an insurance policyholder has a property interest in the insurance policy and its proceeds.  *See, e.g.*, *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993) ("Several different parties may have a property interest in [an insurance policy] or its proceeds, including the owner, the insured, and the beneficiary . . . ."); *see also In re McLain*, 516 F.3d 301, 313 (5th Cir. 2008) (discussing property interest in insurance policy); *In re Morrison*, 403 B.R. 895, 902 (Bankr. M.D. Fla. 2009) (same).  By requiring that it be added to Airbnb's policy, the City is carving out a property interest for itself—without providing Airbnb with any compensation.  Seizing an interest in the policy's proceeds effects a *per se* takings, representing "a direct government appropriation . . . of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

The City presents no argument that Airbnb does not have a property interest in its insurance policies, nor does it deny that requiring the addition of the City to such policies would effect a taking.  It says only that this type of insurance requirement is typical in New Orleans, citing other provisions of the Code with similar requirements.  *See* Mot. at 31-32.  But it cites no support for the notion that this practice is constitutionally sound.  If the City seized Airbnb's entire insurance policy, there can be no doubt it would be a taking; the fact that it is seizing a portion of Airbnb's

insurance rights does not make a difference. *Cedar Point*, 594 U.S. at 153 ("the size of an appropriation . . . bears only on the amount of compensation").

## CONCLUSION

The Court should deny Defendant's motion to dismiss Plaintiffs' Amended Complaint.

DATED: June 17, 2025

Respectfully submitted,

*/s/ Mark A. Cunningham*

Paul D. Clement*
Clement & Murphy PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

Mark A. Cunningham
Madeline M. Freese
Jones Walker LLP
201 St. Charles Ave
New Orleans, LA 70170
(504) 582-8536
mcunningham@joneswalker.com
mfreese@joneswalker.com

Jeffrey M. Davidson* (T.A.)
Covington & Burling LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
jdavidson@cov.com

Alexander A. Berengaut*
Chloe Goodwin*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com
cgoodwin@cov.com

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*

38